(37 Misc. Rep. 1.)

## PEOPLE v. GLENNON.

(Supreme Court, Special Term, Kings County. January, 1902.)

1. ARREST WITHOUT WARRANT—MISDEMEANOR.
   A police officer cannot arrest for a misdemeanor without a warrant, unless it was committed in his presence.

2. SAME.
   A police officer cannot arrest for a misdemeanor without a warrant on his own suspicion or hearsay.

3. SAME—FELONY.
   Where a felony has been committed, a police officer may arrest without a warrant any person he has reasonable grounds to believe committed it, but a citizen takes the risk of the person arrested not being the real felon.

4. SAME—RIGHT OF SEARCH.
   Laws 1897, c. 378, § 315, making it the duty of the police of the city of New York to inspect certain enumerated places, and restrain all unlawful conduct therein, does not confer on the police officer the right, without a warrant, to invade or search a house on his mere suspicion that misdemeanors are committed therein.

5. SAME—INSTRUCTIONS.
   An instruction, on the trial of a policeman for willfully neglecting his duty in failing to detect and arrest the keeper of a disorderly house, that the policeman might lawfully arrest without a warrant on his conscicus knowledge that the house was disorderly, is erroneous.

6. CRIMINAL LAW—IMPEACHMENT OF WITNESS.
   A person confined for another crime confessed to a magistrate that he was the accomplice of a policeman charged with the misdemeanor. After being bailed, he was called by the prosecution on the trial of the policeman. Held, that the defense could show that the witness had been rearrested on the morning of the trial, and his bail raised, with a view to coercing him to repeat the confession he had made to the magistrate.

Edward G. Glennon was convicted of misdemeanor, and applies for a certificate of reasonable doubt. Certificate granted.

James W. Ridgway, Ira Leo Bamberger, and Charles H. Hyde, for the application.

James W. Osborne, Arthur C. Train, and Howard S. Gans, Asst. Dist. Attys., for the People.

GAYNOR, J.   The term of imprisonment imposed being only six months, the defendant is really without redress if the conviction be erroneous unless a certificate of reasonable doubt be granted, for otherwise he would probably have served out his term before his appeal from the judgment could be disposed of.

I am reluctant to express an opinion on the case on account of the eminent learning and ability of the trial judge; but it seems to me that by the whole course of the trial, and for lack of instructions on the limits of the power or right of policemen to invade houses or make arrests, the jury were led to convict the defendant on a theory which is wholly false and dangerous.

The indictment accuses the defendant, a patrolman on the police force, of the misdemeanor of willfully neglecting to perform his duty, in that he neglected to detect and arrest the woman keeper of a certain house of ill fame; the keeping of such a house being a misdemeanor.   The indictment is loose and verbose, but this is the principal accusation it contains.   It is not easy to see that it contains, or could contain, any other legal accusation.   It contains such empty accusations as (in substance) that the defendant did not "repress" and "suppress" the house.   What this means I do not know, unless the draftsman entertained the dangerous notion that policemen have the right to go about at will invading, raiding and "suppressing" houses and arresting persons without a warrant, acting at once as accuser and judge.   If they had such power then anyone could be suppressed by the police and our government would no longer be free, but a despotism.   That they have not such power should not need to be stated.

I. The learned trial judge recognized that the defendant had no right to arrest the keeper of the house, or procure a warrant for her arrest, unless he had knowledge that the house was a house of ill fame.   He therefore stated to the jury that the question was, did the defendant, "with knowledge of its character, willfully neglect and omit to perform the duty enjoined upon him by law in reference to that house"?   But he then said on the subject of how such knowledge might be acquired, viz.:

"The knowledge of the existence of the house may be acquired by the defendant in different ways.   It is not necessary that there should be evidence before you of someone having told him that such house was a house of ill fame; nor is it necessary that there should be evidence before you which would prove that the defendant saw disorderly and indecent practices and conduct in that house in order to charge him with knowledge of its existence."

I find myself quite unable to understand this.   The learned trial judge had to instruct the jury, as he did, that knowledge in the defendant of the character of the house was necessary, but he then straightway instructed them that such knowledge could be acquired by the defendant otherwise than by what anyone had told him, or anything he had himself seen, i. e., in other ways than by either hearing or seeing.   Man has but five senses, and, excluding these two, the only ones left for the defendant to have acquired such knowledge by were smelling, tasting or touching.   How he could have obtained knowledge of the character of the house and its

inmates by these was not explained. The learned trial judge, how-ever, in emphasizing the matter, stated further to the jury as follows:

"It is the conscious knowledge that such a house was a disorderly house, knowing it to be such; and however that knowledge was conveyed to him, or however that knowledge was acquired by him, if he did have that knowl-edge, becomes material, if you find as a fact on this evidence that he had knowledge that that was a house of ill fame."

The learned trial judge thus instructed the jury that they could find that the defendant possessed what he termed a "conscious knowledge" of the character of the house, though he did not ac-quire it by either hearing or seeing. I am at a loss over this. What is this "conscious knowledge" that one may get possessed of without the aid of the senses? Such an inquiry seems to lead us into the occult realm and mysteries of psychology. You would not like to have it possible that every or any policeman may imagine he is conscious of something being wrong in your house and invade it and arrest you. What would a magistrate say to a policeman who should apply to him for a warrant on such a theory as that?

The counsel for the defendant tried to remove the effect of such instructions from the minds of the jury and not let them retire free to act on mere suspicion, or belief founded on no evidence, by re-questing the learned trial judge to charge the jury as follows:

"The defendant might have had the strongest moral certainty in the world that the house was a house of prostitution, yet if he did not know of somebody who could swear of his own knowledge to the facts of which the defendant was morally certain, the defendant had no right to make an arrest. Such an arrest would have been wanton, and an indefensible act of false imprisonment."

But the learned trial judge refused to charge this. The converse of the request thus refused is that although there was no one, i. e., neither the officer nor anyone else, who could swear to the neces-sary facts to obtain a warrant, nevertheless the officer had the right to invade the house and make the arrest, i. e., on his suspicion or moral certainty, or on what the learned trial judge had called "con-scious knowledge" of the character of the house which the officer might have possessed although he had no facts to base it on. It seems to me that this all conveyed to the jury that the lawless raids which are so often made without warrant by the police in the county of New York on hearsay or suspicion are really lawful, and that that was the course this defendant should have followed.

Instead, the jury, as it seems to me, should have been carefully instructed as to the strict and jealous limitations which the law puts on the power of policemen to enter houses or make arrests. For instead of police officers having the tyrannical powers of ar-rest attributed to them, they in fact have no power to arrest for a criminal offense without a warrant which every citizen does not possess. Every citizen has always had, and is expressly given by statute (Code Cr. Proc. § 183), the right and the power to arrest and take before a magistrate without warrant a person who com-mits any criminal offense, whether misdemeanor or felony, in his view; and if a felony has in fact been committed, although not in

his view, he may in like manner arrest without warrant the person. who committed it. But while all citizens have this "right," it is not their "duty" to make arrests, nor have they the time for such work. They have, therefore, by their laws provided for the appointment and payment out of their substance of certain citizens called police or peace officers for such work; but in such laws they have taken care to give such officers no right or power of arrest without a warrant which every citizen does not possess. Code Cr. Proc. § 177. A policeman (to speak plainly) is only a citizen dressed in blue clothes and brass buttons, with no right or power to arrest without a warrant which all his fellow-citizens do not possess; and he should be taught by those in authority over him not to forget this. The citizens have not made him their master, but only their honorable servant, with no power to arrest anyone except as provided by law. The only exception or addition to the foregoing is that where a felony has in fact been committed, although not in his view, a policeman may without a warrant arrest any person he has reasonable ground for believing to be the one who committed it, whereas a private citizen may arrest in such a case only on absolute certainty at the hazard of being sued for damages for false imprisonment if he arrests the wrong person.

But the law does not tolerate the idea that anyone may be arrested by a police officer for an alleged criminal offense of the grade of misdemeanor only, except on a warrant duly obtained from a magistrate, unless the offense was committed in the view of the officer. If a police officer knows facts which show that a criminal offense of the grade of misdemeanor has been committed, but which he did not see committed, then there is only one course for him to pursue; i. e., his duty is to go before a magistrate and make a written complaint under oath of such facts and obtain a warrant, and then make the arrest with such warrant. If the officer does not know such facts, but some person who professes to know them tells him of them, the officer cannot himself obtain a warrant, much less make and arrest without warrant, on such hearsay. His duty is to send such person to a magistrate to make the necessary written complaint on oath to obtain a warrant, or, in some grave cases, it may be that he should accompany such person before the magistrate.

This is all plain statute law, and has been declared by the courts many times. It is not new with us, but was inherited by us from the common law of England, and is common to every free state. It marks the difference between a free government and a despotism. It is thoroughly understood by the people in every locality in this country, except the city of New York, where the rights and liberties of the people have so long been trampled upon by the ignorant persons who have been put in rulership over the police that the citizens seem to have forgotten them. So far has this gone that the police may in the city of New York, without a warrant, raid, arrest and lock up over night several hundred people found in a public hall or room, against whom there is no pretense of any criminal charge whatever, or drive the delegates to a political conven—

tion out of the convention hall, without exciting any public protest or even comment. On the other hand, in England the unlawful arrest of the humblest woman or man would arouse a public protest which the crown would have to heed for its own safety, and which would be the subject of vigorous condemnation in parliament next day.

I have said the foregoing, which is household knowledge everywhere outside of the city of New York, only because the jury in this case were not instructed as to the limitation of the power of this defendant as a policeman to invade houses or make arrests without a warrant, but were, on the contrary, as it seems to me, allowed and encouraged from the whole tenor of the trial to believe that policemen have the right to invade and search houses and make arrests without warrant and on mere suspicion or hearsay. If it were so that we are all open to have our houses invaded, ransacked and searched by policemen on nothing except what they may choose to call their suspicions, and that we may be arrested in the same way, we would not be living under a free government, but under a most intolerable despotism, the like of which former generations struggled against until they obtained those guaranties of individual rights and liberties which made them free, the chief of which were that their houses should not be invaded and searched, and that they should not be seized except by due warrant and process of law.

The far-reaching constitutional maxim that every man's house is his castle has a history and a literature all its own, and is still as expressive and pregnant of the individual rights and liberties of a free people as when it first emanated from what Coke called the unpolished genius of the people. It burst asunder the bonds of despotic power. It is as vital now as when Chatham said of it:

"The poorest man may in his cottage bid defiance to all the forces of the crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England may not enter; all his force dares not cross the threshold of the ruined tenement." Cooley, Const. Lim. 364.

The constitution of the United States contains the following provision:

"The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Const. Amend. art. 4.

It is true that this provision is operative on the federal government only; but it was adopted word for word in the bill of rights in this state (1 Rev. St. p. 93, § 11), which has always been deemed to have the force of fundamental law. 2 Kent, Comm. 12.

2. The defendant testified that he looked several times at the house in question from the outside and sought admission to it and was refused, after someone had written to his captain that it was an improper house, but that he learned no facts on which he could obtain a warrant for the arrest of the head of the house upon a

charge of keeping a house of ill fame. The jury apparently believed him and were evidently puzzled, in view of the instructions they had received, and the refusal of the learned trial judge to instruct them as requested, that the defendant could not act without actual facts which could be sworn to in court so as to get a warrant, for they returned to court and submitted the following question:

"If Officer Glennon could not obtain evidence in the manner sworn to by him, was it his duty under the law to employ other means?"

Here was a call for instructions as to the scope of his duty and as to what means he could lawfully employ. Evidently the jury wanted instruction; in answer to which the learned trial judge only read to them again (for he had read it in his charge) from section 315 of the city charter as follows:

"It is hereby made the duty of the police department and force at all times of the day and night, and the members of such force are hereby empowered to carefully observe and inspect all houses of ill fame or prostitution, and the houses where common prostitutes resort or reside, and to repress and restrain all unlawful and disorderly conduct or practices therein, to enforce and prevent violation of all laws, and to arrest all persons guilty of violating any law for the suppression and punishment of crime."

The learned trial judge let this crude enactment go to the jury without any explanation of it whatever, and to be interpreted by them as best they could and in their own way. He did not tell them that this loose provision does not do away with the necessity of first getting evidence that a house was such a house, and that even then a policeman could not enter it or arrest the keeper without a warrant, unless the facts which showed the offense occurred in his view. Accepted in all its looseness it might seem to a layman to do so, but it does not. It purports to make it the duty of the police to arrest all persons guilty of violating the laws. This duty exists independent of such provision, which adds nothing to such duty. But such arrest can only be made as allowed by the constitution and laws; and the right and power of arrest I have already defined.

It needs also to be observed that the charter provision is not as read by the learned trial judge. It seems to me that the jury might all the more easily have put a wrong interpretation upon the parts consecutively read, though they are not in that consecutive form in the statute. Read consecutively the whole provision is that it shall be the duty of the police day and night to "carefully observe and inspect all places of public amusement; all places of business having excise or other licenses to carry on any business; all houses of ill fame or prostitution and houses where common prostitutes resort or reside; all lottery offices, policy shops and places where lottery tickets are sold or offered for sale; all gambling houses, cockpits, ratpits and public common dance houses, and to repress and restrain all unlawful and disorderly conduct or practices therein," &c.

This is certainly a most extraordinary enactment. Lawful and unlawful businesses and places are enumerated in one common class,

and it is provided that the police shall "carefully observe and inspect them" and "repress and restrain all unlawful and disorderly conduct or practices therein." It is easy to understand how policemen may be detailed to duty in places of public amusement, public halls, public dancing halls, licensed public places and other lawful public places, to "carefully observe and inspect" them and "repress and restrain all unlawful or disorderly conduct or practices therein." But does this statute mean that policemen may be detailed to duty in the houses of ill fame, to "carefully observe and inspect" them, and prevent "unlawful or disorderly conduct or practices" in them also; in a word, to keep order in them? And what would be unlawful in such a house? Our criminal laws do not make the act of kind unlawful; it is only the keeper of such a house who is guilty of a criminal offense. To interpret this strange statute to mean that the police may be detailed to duty in such houses for the purpose of keeping order in them would be to hold that they are legalized thereby and put under the visitation, observation and regulation of the police. It does not seem that any such thing can be meant by it. And if on the other hand it could be construed as giving the police the right to arbitrarily enter houses at will on suspicion and search them, and arrest therein, all without warrant, it would be void. The learned assistant district attorney disclaimed any such meaning on the argument. When the police are not required to keep their place, and to their principal duty of preserving the public peace, and keeping outward order and decency, but are permitted to go beyond the law and invade houses without warrants, and arrest in the same way for misdemeanors not committed in their presence, the inevitable result is general oppression, extortion and even blackmail by them upon the community. Crimes and vices are evils to the community, but it should never be forgotten by a free people that they have far more to fear from the growth of the vice of arbitrary power in government than from all the other vices and crimes combined.

3. A witness named Whitney was called by the prosecution and gave testimony which, if credited, made him an accomplice with the defendant in protecting the keeper of the house in question from detection or arrest. It was made to appear by his cross-examination that he had himself been arrested several months ago on charge of another crime; that thereupon he made a confession to the magistrate which showed him to be such accomplice, and was released on bail of $2,000, and never afterwards called up for examination; and that on the morning of the trial of this present case he was rearrested at the instance of the district attorney in order to coerce him to testify in accordance with his said confession on such trial, as was claimed. In order to show such coercion he was asked if the district attorney had not on such rearrest raised his bail to $10,000, and an objection to the question was sustained. It seems to me that this was substantial error. It may be probable that the jury did not believe Whitney at all, for experience and history show that men of the kind and character his examination revealed him to be cannot be safely believed even when human life is at stake, but

whether the jury credited him cannot be known with certainty. Nor is it an answer to say that there is other evidence showing that he was coerced into testifying. The excluded evidence might well have been deemed conclusive on that head. He was rearrested in order to induce him to testify, and the exacting of such large bail might well have made his release impossible except by his yielding and testifying.

4. This was one of those trials where the defendant is entitled to be carefully guarded from the influence of clamor and prejudice. It seems to me from the whole tenor of the trial that he was treated quite the reverse of this. It seems to me that in the zeal of the hour the very able and conscientious prosecuting attorney forgot his duty in this respect. As I understand it, the people of the state do not want their district attorneys and judges to strain themselves to convict anyone. If the plain facts fairly presented do not convict, then the people of the state do not want a conviction. And this is doubly true of a case like this, where a mere patrolman is brought up and accused of neglect to arrest keepers of houses which have long been tolerated, are now tolerated, and apparently are to continue to be tolerated, by those in chief authority over the police and over all of us. If such a neglect is to be the subject of indictment, one may well wonder why those in chief authority should not be indicted first. It seems, moreover, that if we except another recent case which arose in New York county, no one was ever before anywhere convicted of what this defendant stands convicted of.

"Owing to the odium lately brought on the police force by the conduct of persons put in rulership over it, to accuse a policeman of any offense was, to borrow a saying from a historic case, to "put on him a caput lupinum, and offer him as a prey to mankind." Rex v. Rusby, Peake, 189. In ancient times accused persons could fly for refuge to established sanctuaries, especially in times of clamor. A safe sanctuary to accused persons with us should always be a court of justice, no matter what the hue and cry outside may be.

There are also other rulings on the admission of evidence which raise a reasonable doubt.

Let the certificate issue.