## UNITED STATES v. PAPPADEMENTRO.

(Fourth Division. Fairbanks. December 11, 1922.)

No. 884, Criminal.

**1. Arrest ⬤═65—Searches and Seizures ⬤═5—Constitutional Law.**

Two deputy marshals, with a warrant for the arrest of the defendant and another upon charge of violating the provisions of the Alaska Bone Dry Law (U. S. Comp. St. 1918. U. S. Comp. St. Ann. Supp. 1919, §§ 3643b–3643r) being a mere misdemeanor, went to defendant's residence, "made a slight alarm" at the door, but received no answer, and, finding the door unlocked, entered. While searching the house for the owner, as they claim, in order to serve their warrant of arrest upon him, they discovered a large quantity of bottled liquor, which the government claims to be beer, in his private dwelling. On motion the defendants ask to have this evidence suppressed, because obtained in violation of his constitutional rights. *Held*, the warrant for arrest for a misdemeanor, under the facts in this case, did not authorize the officers to invade the defendant's private dwelling. The evidence was obtained in violation of defendant's constitutional rights, and will be suppressed.

**2. Arrest ⬤═65—Searches and Seizures—Intoxicating Liquors.**

Two deputy marshals, with a warrant for the arrest of the defendant, went to the door of his private dwelling and made a slight alarm, to secure attention to their demand for entrance. There was no one in the dwelling; whereupon the officers entered and searched the premises in matters not connected with their warrant of arrest. *Held*, under the circumstances, the officers had no lawful authority to enter the defendant's private dwelling under the warrant of arrest.

Objection is made on behalf of defendants to the admission of what is alleged to be incriminating evidence against them, obtained by two deputy marshals by a search of their residence made pursuant to what the defendants claim was an unlawful entry. The facts are these:

Deputy Marshal Mossman held a warrant for the arrest of defendants and another upon a charge of violating the Alaska Bone Dry Law (U. S. Comp. St. 1918, U. S. Comp. St. Ann. Supp. 1919, §§ 3643b–3643r), but not the specific offense charged herein. The officers arrested George Pappadementro and the third man, but were told by George that Chris Pap-

pademento was out. After awaiting his return a little while, they went to the house occupied as a residence by the defendants, in the rear of their business building, "made a slight alarm" at the door, as testified by one of them, but received no answer, and, finding the door unlocked, entered. While searching the house, as they claim, for Chris Pappademento, in order to serve the warrant upon him, they discovered a large quantity of bottled liquid which the government claims is beer. This is the evidence which defendants seek to have excluded from the case.

Sherman Duggan, U. S. Atty., of Anchorage, and Tulien A. Hurley and Harry G. McClain, Asst. U. S. Attys., both of Anchorage.

James S. Truitt and J. C. Murphy, both of Anchorage, for defendant.

RITCHIE, District Judge. The question is governed by sections 2394, 2395, 2396, and 2397 of the Alaska Code, and general law on subject of arrests. These code sections read as follows:

"Sec. 2394. That the defendant is not to be subjected to any more restraint than is necessary and proper for his arrest and detention.

"Sec. 2395. That the officer must inform the defendant that he acts under the authority of the warrant, and must also show the warrant if required by the defendant.

"Sec. 2396. That if, after notice of intention to arrest the defendant, he either flee or forcibly resist, the officer may use all necessary and proper means to effect the arrest.

"Sec. 2397. That the officer may break open any outer or inner door or window of a dwelling house, or otherwise, to execute the warrant, if after notice of his authority and purpose he be refused admittance."

Another section of the Alaska Code provides that an officer may make an arrest without a warrant when an offense has been committed in his presence, or when a felony has been committed and he has reasonable grounds to believe that the person he seeks is the guilty party.

The general law governing arrests may be briefly stated as follows: In making arrest for a felony, either with or without a warrant, an officer may use any reasonable force necessary to detain the accused person, but he must use no more than is necessary. If the accused resists, or attempts to es-

cape, the officer may defend himself or stop the accused in his flight, even to the extent of killing him, if necessary; but this is only a last resort. If the accused person is running away, it is the duty of the officer first to seek to overtake him. If he is unable to do so, he may fire a gun after him, but should first shoot over his head, or into the ground near him. If that fails to accomplish his purpose, the officer then has a right to shoot at the accused direct; but he should shoot at his legs, to stop him, if possible, rather than at his body, with the strong probability of killing him.

In misdemeanors, while an officer may use all reasonable force when making a lawful arrest, either with or without a warrant, he cannot go so far as to take life; the law setting too high a value on human life to permit it to be taken rather than allow a man charged with a misdemeanor to escape.

In the matter of searching houses, all the foregoing rules govern. As the statute provides, an officer may break into a house to apprehend an accused person, if he is refused admittance. He not only can enter the house of the man accused, but he may enter the house of another person, who is giving refuge to the accused, after stating his business, and being refused, and the owner of a house sheltering an accused person resists the officer at the same peril as the accused.

None of these rules apply to the present case. The statute expressly says that an officer may break into a house to serve a warrant after demand and refusal of admission. It is argued by the prosecution that when an officer knocks at a door and receives no response he is then warranted entering the house by force. This would be true in case the officer had reasonable grounds to believe that the man wanted was in the house, and would probably escape if not immediately apprehended. I think this would be true, even in case of a misdemeanor; but in this case the testimony of the officers not only fails to show that they had any apprehension that the defendant Chris Pappadementro might escape if not immediately arrested, but their testimony shows conclusively that there was no grounds for any such apprehension.

The defendants were engaged in business in adjoining rooms—George Pappadementro conducting a restaurant, and Chris Pappadementro a pool hall—both known as "The Nugget." It is unthinkable that Chris Pappadementro would try to leave

town and abandon his business and everything he owned to avoid arrest for a misdemeanor. The officers do not testify that they had any such fear. They testified merely that they waited for him until they got tired, and then went into his house. This conduct is not justifiable by any public necessity. While it is true that a man's house is not exempt from entrance by an officer on lawful business, the right of an officer to enter, even when armed with a warrant, is limited by circumstances. Where it appears necessary to prevent the escape of an accused person, as already said, the entrance by force is lawful, and in that case "there is no castle against the king."

Let us see to what an extreme this argument in favor of the officers' authority might lead, if it were accepted. Suppose a deputy marshal in Anchorage holds a warrant against a well-known property owner, charging him with possession of intoxicating liquor, and to serve that warrant he goes at 3 o'clock in the afternoon to the defendant's house and raps at the door. It might happen that defendant's wife, alone in the house, is bathing. According to the contention of the prosecution, if she fails to make a response to the rap on the door, the deputy marshal would have the right to break in the door and search the entire house, including the bathroom.

The prosecution argues that the right contended for here is necessary because, otherwise, accused persons might occasionally escape. There are two answers to this: One has already been pointed out—the unreasonableness of breaking into a residence seeking a defendant charged only with a misdemeanor merely on suspicion that he might be found there. The other is that, if the officer with a warrant fears the defendant might escape from the house he can easily post some one at the other end of the house, or one at each of the four corners of it, if necessary. In this case there were two deputy marshals; one might easily have gone to the back of the house, while the other remained at the front entrance, if they believed the defendant was there and might escape.

I have examined all the law I can find in Anchorage on this subject, and have found nothing inconsistent with the foregoing statement. The best review is to be found in a long case note to one of the cases cited by the prosecution. Hawkins v. Commonwealth, 61 Am. Dec. 147. There a great many

cases are reviewed, and in none of them can any principle of law in conflict with what I have stated be found. In all of the cases cited by the prosecution the house broken into had occupants who refused admission after demand made. Bishop in 1 New Crim. Proc. § 201, says:

"Whether the lawful breaking is of an inner or outer door, it can be done only after the officer has notified the inmates of his business, and demanded admittance. 'Otherwise', asked Abbott, C. J., 'how is it possible for a party to know what the object of the person breaking open the door may be? He has a right to consider it as an aggression on his private property which he will be justified in resisting to the utmost.'"

The note to the Hawkins Case (61 Am. Dec. 157) states the following:

"An officer cannot lawfully break either an inner door or an outer door, * * * until he has disclosed to the inmates of the house his purpose to arrest some one inside, and demanded admittance. Otherwise it would be impossible for one to know what the object of the person breaking open the door might be, and the owner has a right to consider it an aggression on his private property, which may be resisted to the utmost."

On page 161 of 61 Am. Dec. the note continues:

"The amount of force which may be lawfully used in effecting an arrest is no more than is actually necessary to secure the arrest and safe custody of the accused."

Further the note says:

"Murfree, in his work on Sheriffs, section 148, remarks 'that there is prevalent, not only among officers of every grade, but throughout the community, an exaggerated idea of the powers, in this respect which the law vouchsafes to its ministers. A sheriff, constable or policeman with a revolver and a warrant charging a misdemeanor, is popularly supposed to hold the keys of life and death, and, as he frequently shares in the delusion, he abuses his powers with sometimes very tragical results. What the law does allow in the use of physical force is the very minimum by which the desired object can be attained. Whatever a rash or overzealous officer may do in excess of this is without warrant of law.'"

The deputy marshals who made the search and seizure in question are experienced and usually discreet officers, but they erred in the exercise of their authority and powers under the warrant of arrest. It is important to repress and punish crime, but it is still more important that all proceedings against crime be in strict pursuance of law. Observance of legal procedure

is a weightier consideration in all cases than the punishment of a single offense, and no violation of a constitutional safeguard of human rights should ever be tolerated. As Mr. Justice Bradley observed in Boyd v. United States, 116 U. S. 616, 6 Sup. Ct. 524, 29 L. Ed. 746:

"Illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon."

In People v. Glennon, 37 Misc. Rep. 1, 74 N. Y. Supp. 794, the court delivered the following forceful comment upon the same subject:

"If it were so that we are all open to have our houses invaded, ransacked, and searched by policemen, on nothing except what they may choose to call their suspicions, and that we may be arrested in the same way, we would not be living under a free government, but under a most intolerable despotism, the like of which former generations struggled against until they obtained those guaranties of individual rights and liberties which made them free, the chief of which were that their houses should not be invaded and searched, and that they should not be seized except by due warrant and process of law. The far-reaching constitutional maxim that every man's house is his castle has a history and a literature all its own, and is still as expressive and pregnant of the individual rights and liberties of a free people as when it first emanated from what Coke called the unpolished genius of the people. It burst asunder the bonds of despotic power. It is as vital now as when Chatham said of it: 'The poorest man may in his cottage bid defiance to all the forces of the crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the king of England may not enter; all his force dares not cross the threshold of the ruined tenement.' Cooley, Const. Lim. 364."

This matter appears to me to come under the Fourth Amendment to the federal Constitution, which prohibits unreasonable searches and seizures. This was a case of search for a defendant charged with a misdemeanor, who could not possibly have escaped in defiance of even ordinary vigilance to apprehend him. Had he gotten out of town, he could have been

apprehended before going far.  It made no possible difference in the administration of law whether he was arrested that afternoon or the next day.  I do not see, under all the circumstances, how the court can do otherwise than hold that this is an unreasonable search, made in violation of the Fourth Amendment.  If any person had been in the house and had refused admittance, the officers would have been justified in entering by force; but they had no right to assume, because there was no response to their alarm, that the defendant was in hiding there.  The natural supposition would be that a man engaged in business was around town somewhere in the middle of the afternoon.  A search having been made, as I regard it, in violation of law, no evidence obtained by the search is admissible in this case or in any other.

The objection to any testimony by the witnesses Mossman and Watson, describing what they did after entering the house, is sustained.

END OF CASES IN VOL. 6

*