Charles Solomos, M.
The complaint herein charging disorderly conduct was dismissed on the People’s ease for insufficiency of proof. It reads: ‘ ‘ that on February 20th, 1957, at the north east corner of Ovington and Fourth Avenues, in the County of Kings, about 1 p.m., City and State of New York, the defendant, Albert Tinston, committed the offense of disorderly conduct in violation of Section 722, subdivision 2, of the Penal Law, in that with intent to provoke a breach of the peace and under circumstances whereby a breach of the peace might be occasioned, the defendant was standing thereat and two men approached the defendant and after a short conversation left and the defendant then looked at the deponent who was in a parked car with his partner and walked away going down Ovington Avenue toward Third Avenue. The deponent drove after the defendant and shouted to him that he wanted to talk to him and the defendant stated ‘ Who are you? ’ And the deponent identified himself as a police officer, showing the defendant his shield. The deponent then asked the defendant to identify himself and when refused took him to the 64th [Precinct] police station where before the desk officer the defendant identified himself. The defendant by his actions, using loud and boisterous language to the annoyance of persons living in the vicinity and passersby.”
*486 Subdivision 2 of section 722 of the Penal Law reads: “ Acts in such a manner as to annoy, disturb, interfere with, obstruct, or be offensive to others ”.
The arresting officer was the sole witness for the prosecution. He testified that he and a brother officer, each in plain clothes, were seated in an automobile at Ovington and Fourth Avenues. They were there in response to a complaint. This was on February 20 at about 1.00 p.m. The defendant was observed coming from Bay Bidge Avenue. He had “ stopped to talk to two different men at two different intervals.” He walked ‘ ‘ towards the direction of our vehicle, looked us over, and then immediately went south down Ovington Avenue toward Third. As he walked down he continually turned around to look at us. So we immediately went down the block there and approached him. And we said we’d like to talk to him, to you a minute. I identified myself as a police officer to him. And he says, ‘ I don’t care who you are. Where do you punks think you are, Bussia, Germany?’ I then said, ‘I identified myself to you; now I’d like to see your identification.’ He said: ‘ I aint showing you anything ’ causing three people in the vicinity to gather around because he was hollering. I then said, ‘ Now, will you show us your identification?’ I tried again and he started hollering, 1 aint showing you nothing; you better put me under arrest.’ I says, * Now, calm down.’ He says Don’t tell me to calm down.’ I placed him under arrest. I brought him into the 64th precinct whereupon while going to the precinct I asked Trim, ‘ Now, where do you live; you’re under arrest.’ He says, * I live in Brooklyn.’ I says, ‘ What’s your name?’ He says, ‘ You find out.’ We went into the 64th precinct. We did find identification on him that he worked for the telephone company.”
The following colloquy then ensued between the witness and the court: “ Q. Officer, I would like to know what you arrested this man for. A. Disorderly conduct. Q. Where is the disorderly conduct? A. Due to the abuse hollering and causing people around there to stop. Q. Look, Officer, this is your story: Here is a man who is walking on the streets of the Borough of Brooklyn, where presumably he has a right to be. This man stops to talk to two people, which he had a right to do. He approaches your car for some reason undisclosed in this record —it is entirely beside the point anyway — he turns away and walks down the thoroughfare. You and another police officer proceed after him. Up to this point there isn’t a thing that this man has done which he did not have a perfect right to do. He is, up to this point, a law abiding citizen. You, notwithstanding *487 the fact that up to this point he has done nothing he did not have a perfect right to do, you and your brother officer get out of the car and you stop this man, something you did not have the right to do, and you proceed to ask this man questions which he refuses to answer, which he had a perfect right to do. You ask him to disclose his identity to you. He refuses. He had a perfect right to refuse to disclose his identity to you. He begins to shout and get excited. Under the circumstances that is entirely understandable. If anyone was attracted to what was going on you and your brother officer were responsible. Not he. You thereupon tell this man * * * to calm down. You had no right to do what you did in the first place. You thereupon arrested this man, exceeding your rights and powers under the circumstances, and you take him to the police station under arrest, an unlawful arrest on your part. You then, in the police station, discover he works for the telephone company * * *. You cannot stop a citizen on the street and tell him to identify himself to you. He has no such legal obligation. If he is guilty of any violation of law, arrest him and charge him with the violation of law. But the only alleged violation of law you are charging this man with is disorderly conduct and there is no disorderly conduct here whatsoever.”
At this point the court directs attention to the disparities between the allegations in the sworn complaint and the sworn testimony of the arresting officer. According to the former, the first “ shouting ” was that of the police officer. And the only remark attributed to the defendant is: “ "Who are you?” Entirely natural under the circumstances. It is impossible for this court to escape the conclusion that the real reason for the arrest of the defendant is the fact that he refused to disclose his identity to the police. The complaint herein recites: “ The deponent then asked the defendant to identify himself and when refused took him [the defendant] to the 64th [Precinct] police station where before the desk officer the defendant identified himself.” What follows strongly suggests' afterthought. This court knows of no legal mandate obligating the citizen to reveal his identity in circumstances such as are here related.
The defendant, it appears, is a married man and several times a grandfather, For 33 years he has been employed by the telephone company. For about 20 years his place of employment has been in the immediate vicinity of his encounter with the police, in a highly responsible position. This was his only arrest. For many years he has been identified with the church of his denomination. In a letter addressed to the court, his pastor writes he has known the defendant and his family for *488 20 years, and holds him in high regard. The defendant’s attorney has known him for more than 20 years. The defendant apparently was on the street during the lunch period.
The disorderly conduct statute is concerned exclusively with the preservation of the public peace. (People v. Perry, 265 N. Y. 362; People v. Chesnick, 302 N. Y. 58.) The record is completely barren of any proof that there was any intent upon the part of this defendant to provoke a breach of the public peace or that he did anything whereby a breach of the public peace might have been occasioned. There was no breach of the public peace. There is absolutely no proof that the defendant used ‘ ‘ loud and boisterous language to the annoyance of persons living in the vicinity or passersby.” The immediately foregoing quoted language is stock phraseology in this type of complaint but this court does not recall a single instance in which such allegedly annoyed persons were produced in court.
If three people stopped, the police were as much responsible for their presence as was the defendant, if not more so. (People v. Sternberg, 142 Misc. 602, 603.) We do not know who they were. We do not know why they stopped, where they stopped nor how long they remained. Nor do we know if they all stopped at the same time or at different times. It is entirely possible that what attracted their attention was the shouting, in the first instance, of the police officer.
To say that the defendant ‘ ‘ hollered ’ ’ is conclusory. ‘ ‘ There is an increasing tendency to employ section 722 whenever it is determined a person should be arrested. This should not be countenanced by the courts.” (People v. Swald, 190 Misc. 239, 241.) The court feels constrained to say that more than 16 years of experience as a Magistrate compel the conclusion that the disorderly conduct statute (Penal Law, § 722) is one of the most abused in our entire penal law by both civilians and police. “ The matter of protection from unwarranted arrest is one of the fundamental principles of our jurisprudence.” (People v. Park, 92 Misc. 369, 372.)
An arrest is defined in section 167 of the Code of Criminal Procedure as “ the taking of a person into custody that he may be held to answer for a crime.” (See art. entitled “ Law of Arrest ” in Jan., 1955 issue of “ Spring-3100 ”, p. 12 et seq. official publication of the N. Y. City Police Dept.) It is well to note here that police officers are peace officers (Code Crim. Pro., § 154) and as such are charged with preserving the public peace. They have not only powers but duties and responsibilities (New York City Charter, under caption “ Police Department ”, § 435). In detailing the powers and duties of the *489 police department, the charter provision says, among other things: ‘ ‘ The police department and force shall have the power and it shall be their duty to preserve the public peace, prevent crime, detect and arrest offenders, * * * protect the rights of persons and property” (italics supplied). (Local Laws, 1950, No. 27 of City of New York, § 2.)
It is not to be assumed a police officer, who is a peace officer, would breach the public peace. (People v. Swald, 190 Misc. 239, supra; People v. Lukowsky, 94 Misc. 500; People v. Weissman, 138 Misc. 542.) The powers of arrest vested in police officers and others are strictly defined and limited by law. (Code Crim. Pro., §§ 177, 183; People v. Cherry, 307 N. Y. 308; People v. O’Connor, 257 N. Y. 473; People v. Gallo, 206 Misc. 935.) Where police exceed their authority in making an arrest (Code Crim. Pro., § 177; People v. O’Connor, supra), the victim may employ legally limited force to prevent an offense against his person. (Penal Law, § 246, subd. 3; People v. Cherry, supra; People v. O’Connor, supra; People v. Gallo, supra; cf. City of Monroe v. Ducas, 203 La. 971.) The defendant here could hardly have employed a milder form of resistance to “ prevent an offense against his person.”
In People v. Tedesche (3 A D 2d 220) the court reversed the conviction and dismissed the information, the facts being as follows: Defendant, arrested on a charge of illegal sale of fireworks, a misdemeanor (Penal Law, § 1894-a), broke away and escaped. Later, he surrendered and was arraigned on the fireworks charge. The complaint was dismissed because the officer did not witness the alleged sale and there was no other witness. The defendant was then charged with escape from lawful custody (Penal Law, § 1694), tried and convicted. The court said, in a Per Curiam opinion: “ There having been no legal arrest, the defendant was not in ‘ lawful custody ’ within the meaning of the Penal Law, and his escape was not from the custody contemplated by section 1694.”
This court knows of no provision of law which enlarges the powers of the police or diminishes the rights of the citizen when the charge is the commission of an infraction below the grade of a crime, namely, an offense. In fact, it was said in People v. Pearson (188 Misc. 744, 745): “ even under our present Penal Law the offense of disorderly conduct is at least closely related to the crime of misdemeanor. It is in the nature of a crime and has all the attributes of a crime. The same rules of law and procedure are followed with regard to it as in the case of a crime. The right to summary arrest exists; the complaint must be definite and state a specific charge; the burden of *490 proving a defendant guilty is upon the People and must he established beyond a reasonable doubt; a trial on a charge of disorderly conduct constitutes jeopardy within the meaning of the Code of Criminal Procedure and the Constitution [citing cases] ; the punishment is substantial (Penal Law, § 723); such cases are considered criminal cases for purposes of appeal and the appeals are governed by the Code of Criminal Procedure. (People v. Bellows, 281 N. Y. 67, 72.) ” (See, also, People v. Park, 92 Misc. 369, supra; People v. Moss, 309 N. Y. 429.)
Based on long experience the court is prepared to assume the plain clothes police were looking for persons engaged in bookmaking activities and that the fact that the defendant seemingly conversed with two persons in the course of his perambulations attracted their attention and aroused their suspicions. Their good intentions are not in question here. However, the police' purpose in no wise cuts down the constitutional protections of the defendant. “ The right of the people to be secure in their persons * * * against unreasonable * * * seizures shall not be violated ” (U. S. Const., 4th Arndt.). The New York State Constitution contains the identical guarantee. (N. Y. Const, art. I, § 12.)
Suspicion, no matter how strong, does not confer power where it is otherwise lacking. (People v. Kobryn, 3 A D 2d 132; People v. Orr, 270 N. Y. 193, 196.) In People v. Orr (supra) the unanimous Court of Appeals, in reversing a conviction for unlawful entry, said: “His [defendant’s] conduct at the time of his arrest was suspicious but it did not show that he committed or intended to commit a crime.” Here it cannot reasonably be said the defendant’s conduct was even suspicious. There is no substitute for legal authority, not even the commendability of the police objective.
Circumvention in the name of alleged necessity is fraught with danger. We must be ever on the alert against leaks in the dike of civil rights and this is especially and peculiarly the responsibility of the courts. We cannot afford to treat any such leaks with indifference or casualness. ‘ ‘ Large oaks from little acorns grow.” It was said long ago that a man’s house is his castle secure against unlawful invasion even by the King. (People v. Glennon, 37 Misc. 1.) The constitutional guarantees which encompass the individual do not depart from him when he leaves his “ castle ” for the public streets. Sir Edward Coke wrote centuries back that even ‘ ‘ the King should be under God and the Laws.” And this court will venture the assertion that a policeman should be similarly bound.
*491 This “ small ” case is an apt illustration of what is meant when we say that ours is a government of laws ami not of men. Furthermore, it would not make the slightest difiVsence, as far as the law is concerned, if the suspicions of the poEsse were well founded, which obviously they were not. This type of arrest is altogether too frequently encountered in these courts. We cannot afford the atrophy of our sense of outrage over any instance of violation of constitutional guarantees, especially by public officials sworn to protect the individual against such intrusions (People v. Glennon, supra, p. 6); and this especially now when the free world is confronted with a threat to the survival of its liberties of unprecedented scope and gravity. “ The citizens have not made him [the police] their master, but only their honorable servant, with no power to arrest anyone except as provided by law.” (People v. Glennon, supra, p. 5.)
There is a disturbing tendency among growing numbers of people, which unhappily includes members of the legal profession, to shrug off unsensational and obscure invasions of basic legal rights, of which the case at bar is a clear instance, as “ minor ” and of no serious consequence. However, eternal vigilance continues to be the price of liberty. The fact that a case occurs in the Magistrate’s Court does not mean that the legal rights of the defendant are less. No court is out of bounds to the law. Desirable ends do not justify unlawful means. No chain is stronger than its weakest link and the chain of justice is no exception. There are no judicial lower depths. It is altogether appropriate to note here that in recent years a number of memorable decisions in the United States Supreme Court dealing with civil rights occurred in undramatic cases originating in every instance in the inferior local courts. We are likely to find the issues in such prosecutions intertwined with basic constitutional considerations.
Chief Justice Charles Evans Hughes said years ago that the lower courts were even more important than the Supreme Court because the former constantly came in close contact with so many litigants. Addressing a conference of Federal judges in the nation’s capital, he stated: “The foundation of justice is in the respect for the institutions of the judiciary itself. That respect must always be inspired by those tribunals with which the mass of the people come in contact.” (N. Y. Times, May 25, 1940, p. 9, col. 6.) To Chief Justice Hughes there were no judicial lower depths.
Highly relevant are the words of Justice Sutherland, dissenting, in Associated Press v. Labor Board (301 U. S. 103, 141): “the saddest epitaph which can be carved in memory *492 of a vanished liberty is that it was lost because its possessors failed to stretch forth a saving hand while yet there was time.” And in People v. Barber (289 N. Y. 378, 386) originating in a local court in a small community, in which the defendant was convicted of a violation of a town licensing ordinance concerned, among other things, with the regulation of peddling, it was said in words substantially applicable here: ‘ ‘ Upon this appeal the Committee on Civil Eights of the New York State Bar Association, the Committee on the Bill of Eights of the Association of the Bar of the City of New York, and the Committee on Civil Eights of the New York County Lawyers Association, have filed a brief, amici enrice, by permission of the court. We conclude this opinion by a quotation from that brief: ‘It may seem to some that appellant’s activities were of such a character that, at this critical period in world history, the Courts and the Bar need not be particularly concerned with their repression. But, if appellant’s activities involved the exercise by him of fundamental rights guaranteed by the Federal and State Constitutions, the violation of those rights cannot be disregarded as of trivial consequence. Each case of denial of rights to an individual or to a small minority may seem to be relatively unimportant, but we know now, more surely than ever before, that callousness to the rights of individuals and minorities leads to barbarism and the destruction of the essential values of civilized life. ’ ”