Walter J. Bayer, J.
Unlawfully providing entertainment without a cabaret license in violation of section'436-1.0 of the Administrative Code of the City of New York is the charge. Defendant Ziegler, president of the corporate owner and operator of the Cafe Figaro, defends by emphasizing that the alleged offending “entertainment” was one of the admission free “ Cafe Figaro Chamber Concerts ” given on Sunday afternoon at 3:00 p.m., September 18, 1960. The offered selections were “ Trio Sonata No. 2 in “ C ” Minor” by Bach-Forbes, Schubert’s “ Trio in Bb Major ” and Beethoven’s “ Trio in G- Major Op. 9 No. 1 ” rendered by the Gurevich Trio of violin, viola and violincello.
Cafe Figaro, located at 186 Bleecker Street, in Greenwich Village, New York City, has a restaurant license but serves only coffee, pastries and sandwiches; it serves no alcoholic liquors of any kind.
*430 The defendant Ziegler, a lover of serious music and a patron of the musical arts, arranged for a Summer series of Sunday afternoon concerts at his restaurant. These concerts achieved such stature as to obtain weekly listing in the music section of the Sunday Veto York Times.
That the musical programs involve an expense to the defendant and are seriously motivated can hardly be denied. He has obtained the services of both an over-all musical director and program consultant —the well-known Stefan B. Mengelberg Bauer, permanent conductor of the St. Louis Philharmonic Orchestra — and of a program director, Saul Kurtz, who hires the performers and arranges the programs. The defendant does not charge admission to these concerts; the program prominently proclaims this to the public. Indeed, defendant does not permit the service of food and drink during the performance; he does not allow patrons to enter the premises at such times; and he does not require the persons attending the performances to purchase food or drink as a prerequisite. The costs of the concerts, principally the payment of the musicians, are paid by defendant. That these performances redound to the benefit and credit of Cafe Figaro cannot be doubted.
During the course of the chamber music concert on Sunday afternoon, September 18, 1960, Patrolman Vincent Hughes (though he “ enjoyed the music ”), served upon the defendant a summons charging him with violation of section 436-1.0 of the Administrative Code in that Ziegler did unlawfully provide entertainment without a cabaret license.
To the ordinary layman, it would be manifest that this Sunday afternoon concert by a string trio could not possibly transform Cafe Figaro into “ Cabaret Figaro Common experience and knowledge plainly establish that a cabaret is “ a restaurant or barroom with dancing and singing as entertainment ’ ’. (Webster’s New World Dictionary, College ed., 1955.)
Only in the face of the plainest compulsion should the court disregard the common experience and knowledge of the community. 1 ‘ In construing statutes, the court must not depart from everyday common experience and knowledge. It must not assume that the Legislature in enacting this section acted in a vacuum without regard to ‘“the pooled general knowledge” of the legislators themselves (East New York Sav. Bank v. Hahn, 326 U. S. 230, 234, supra).’ (Lincoln Bldg. Associates v. Barr, 1 N Y 2d 413, 418.) ” (Park-58 Corp. v. Heder, 21 Misc 2d 395, 400.)
*431 Section 436-1.0[1] 234provides for the “ Regulation of dance halls and cabarets Thus, the very opening sentence sets the sense and tone of the statutes. Linking together within the statute “Dance Hall ” and “ Cabarets” at once lays out the course and the thrust of the legislation. The definitions thereafter set out in the section must be viewed in the light of this statutory backdrop.
Under the statute, ‘ ‘ 3. The word ‘ cabaret ’ shall mean any room, place or space in the city in which any musical entertainment, singing, dancing or other similar amusement is permitted in connection with the restaurant business or the business of directly or indirectly selling to the public food or drink.”
By dissection and taking words out of context, the Police Department argues that since a particular dictionary (Funk & Wagnall’s New Standard Dictionary, 1952 ed.) defines musical entertainment as including a concert, ergo, a Sunday afternoon *432 concert of chamber music held admission free in a restaurant, is the “musical entertainment” which makes that restaurant a “cabaret” within the Police Department licensing powers.
Although these words standing alone technically might lend some support to the Police Department’s contention, yet unless otherwise compelled so to do, this court cannot blindly adopt a position so at odds with the facts.
Perfunctory application of statutory definitions despite common experience and knowledge has oft times led some courts into strange and even ludicrous holdings. Thus, a doctor’s office was ruled to be a store (Sterling v. Lapidus, 17 Misc 2d 587, affd. without opinion N. Y. L. J., June 5, 1959, p. 13, col. 1 [App. Term, 1st Dept.]), because the courts there fell into the error of rote in the mechanical application of the particular words making up the statute, ignoring the plain and obvious fact that a doctor’s office is worlds apart from a store. But in Park 58 v. Peder (21 Misc 2d 395, 397, supra) Mr. Justice Maxwell Shapiro, when confronted with the identical situation properly pointed out: 1‘ The rule of the Lapidus case is at variance with what we plainly see in our daily life — is it not likely also to be at variance with the intent of the Legislature when it enacted section 8 (subd. [gg], par. [1]) ? Unless otherwise compelled to do so, this court cannot blindly accept a ruling so inconsistent with reality.”
In Sterling v. Lapidus (10 A D 2d 180) the Appellate Division of this Department reversed the lower courts, and agreed with Mr. Justice Shapiro. The court made this pointed admonition. “ The construction urged upon us by the landlord finds no support in the corrective thrust of the statute (Kauffman & Sons Saddlery Co. v. Miller, 298 N. Y. 38, 44). The words used by Judge Fuld in Kauffman are particularly appropriate; 1 We find no such unreasonable and impossible choice dictated by the scheme of the statute and reject an interpretation of its words which would so clearly offend against common sense. Where the language of a statute is susceptible of two constructions, the courts will adopt that which avoids injustice, hardship, constitutional doubts or other objectionable results.’ ” (Sterling v. Lapidus, supra, p. 185.)
To apply this statutory definition of “ cabaret ” in the manner advocated by the Police Department would make even the corner ice cream parlor with its juke box and nickelodean subject to the statute. (Cf. People v. Hill, 18 Misc 2d 352.) One could hardly conceive such a venerable institution as being a “cabaret”. “ To treat the living organism of the law as if it ‘ contain[s] only the axioms and corollaries of a book of mathematics’ is an *433 impossible oversimplification.” (Cahill, Judicial Legislation [1952], eh. 2, Oliver Wendell Holmes, Jr., p. 39.)
At times in the ascertainment of legislative intention, the courts are truly called upon to determine what the Legislature would have intended on a point not present in its mind, as if the point had been present. (Cardozo, The Nature of the Judicial Process, Lecture I, p. 15.) The court here, however, is not faced with such a dilemma as the report[2] of the legislative committee is fully available.
The Committee on Local Law of the Municipal Assembly in recommending favorable action upon section 436-1.0 directed *434 its provisions against nightclubs or cabarets which ‘£ are simply dance halls, where food is served at exorbitant prices to the time of jazz and tabloid entertainment and also to protect the “ ‘wild ’ ” stranger who frequents such nightclubs and who is not “ at all interested in our great museums of art and history, in our magnificent churches and public libraries, our splendid parks and public monuments. They are interested in speakeasies and dance halls and return to their native heaths to slander New York.” The committee had the conviction that these visitors “ should not be tumbling out of these resorts at six or seven o’clock in the morning to the scandal and annoyance of decent residents on their way to daily employment. ’ ’
Although comment has been made that this legislative report fails to disclose the purpose of section 436-1.0 (People v. Rickoff, Magistrates’ Ct., Upper Manhattan Arrest Part, Oct. 14, 1960) it is hard to conceive of plainer language of legislative purpose. In People v. Rickoff, the court forecloses consideration of legislative history and intendment because the statutory definition is “clear and precise”. But even in the face of language “ clear and precise ”, a court must and should consider the legislative background and path of the statute. All available aids to statutory construction are to be explored in determining the meaning and intendment of a statute (2 Sutherland, Statutory Construction [3d ed.], § 4502). Legislative history is not to be ignored, even if the words be clear. The United States Supreme Court has emphatically asserted the importance of legislative history.
“ In so doing, [applying the statute] the court below refused to examine the legislative history of § 807, on the ground that the section was unambiguous. But words are inexact tools at best, and for that reason there is wisely no rule of law forbidding resort to explanatory legislative history no matter how ‘ clear the words may appear on ‘ ‘ superficial examination. ’ ’ ’ United States v. American Trucking Assos., 310 U. S. 534, 543-44.” (Harrison v. Northern Trust Co., 317 U. S. 476, 479.)
I am convinced that critical difference exists between a cabaret — i.e., a restaurant with dancing and singing as entertainment— and Cafe Figaro, a coffee, pastry and sandwich restaurant, where an admission free, Sunday afternoon concert of Beethoven, Shubert and Bach-Forbes took place on September 18, 1960. Though to the Police Department such difference may be impalpable, those who came to listen to the Gurevich Trio, could hardly have imagined they were in the kind of place that the Municipal Assembly found frequented by “‘wild’ strangers
*435 The reported cases make reference to the salutary provisions of the statute whereby the Department of Buildings, the Fire Department and Health Department co-ordinate their activities and examine the premises before the Police Department will issue a cabaret and dance hall permit. However, in the case here, the defendant Ziegler had obtained a restaurant permit. Such permit requires all the safeguards of investigation by the various municipal departments in the same manner as obtaining a cabaret license. (See Administrative Code, § C26-1437.0 et seq. covering places of assembly; § 019-161.1 with respect to flame-proofing of decorations, drapes, curtains and scenery.) Hence, no circumvention by ruse or subterfuge exists here as was emphasized in People v. Greenberg (12 Misc 2d 396). In People v. Feldman (178 Misc. 322) the court emphasized that since the license applies to the premises, the character of the event should be the determining factor irrespective of whether the affair was conducted by an association or a caterer. In the instant case, when we look at the character of the event, we find a concert of chamber music performed by a string trio on a Sunday afternoon.
Police officers, in the exercise of their powers and duties, are charged not only with the familiar responsibilities of maintaining the peace and crime detection, but have the more sensitive and vital duty to “ protect the rights of persons ”. (New York City Charter, § 435.) At times over-zealous enforcement begets invasions of fundamental rights. (People v. Tinston, 6 Misc 2d 485.) Not unlike the situation here is the case of People v. Barber (289 N. Y. 378) where the police officer arrested the defendant, who sought to sell copies of the Bible, on his day off at no compensation to himself for a price of 35 cents, just enough to defray the cost of printing. The charge was that the defendant without a license in violation of a municipal ordinance was offering for sale and selling Bibles. In the lower courts, the defendant was convicted.
The Court of Appeals (People v. Barber, supra) reversed, and in so doing, examined the entire ordinance to determine its object and purposes and found that the ordinance could be given its full intended effect without straining its construction to include the laudatory activities of that defendant.
Here, too, the pinch of this statute should not be twisted into a vise closing in on all food places where music is heard or offered. The courts truly perform their function in the democratic scene when they balance reasonable interpretation against strict application which leads to the unjust and the illogic. “It is always presumed in regard to a statute that no unjust *436 or unreasonable result was intended by the Legislature and, if a particular application of a statute in accordance with its literal sense will produce or occasion injustice, another and more reasonable interpretation should be sought (Matter of Meyer, 209 N. Y. 386; Matter of United Parcel Serv. v. Joseph, 272 App. Div. 194).” (duett, Peabody & Co. v. J. W. Mays, Inc., 5 AD 2d 140,149, affd. 6 N Y 2d 952.)
Particularly apposite here is the caution of the amici curiae[3] which the Court of Appeals adopted verbatim in People v. Barber (supra, p. 386): “ It may seem to some that appellant’s activities were of such a character that, at this critical period in world history, the Courts and the Bar need not be particularly concerned with their repression * * * Each case of denial of rights to an individual * * * may seem to be relatively unimportant, but we know now, more surely than ever before, that callousness to the rights of individuals * * * leads to barbarism and the destruction of the essential values of civilized life. ’ ’ That music of this kind is an essential value of our life, cannot be disputed.[4] Liberty, as well as order, is to be cherished and protected.
I find that the defendant in sponsoring and offering these “ Cafe Figaro Chamber Concerts ” did not conduct, maintain *437 or operate a cabaret within the intendment and meaning of section 436-1.0 of the Administrative Code. Accordingly, the complaint is dismissed. The defendant is found not guilty and discharged.

. Pertinent Provisions are set out in full; however the legislative purpose becomes abundantly clear upon a reading of the entire statute.
Chapter 18 — Police Department
§ 436-1.0 Regulation of dance halls and cabarets; licensing thereof.— a. Definitions.— When used herein:
1. The words “ public dance hall ” shall mean any room, place or space in the city in which dancing is carried on and to which the public may gain admission, either with or without the payment of a fee.
2. The words “ public dance or ball ” shall mean any dance or ball of any nature or description to which the public may gain admission.
3. The word “ cabaret ” shall mean any room, place or space in the city in which any musical entertainment, singing, dancing or other similar amusement is permitted in connection with the restaurant business or the business of directly or indirectly selling to the public food or drink. (Subd. a par. 3 as amd. by Local Law 1943, No. 29, July 24; as amd. by Local Law 1945, No. 28, June 25.)
4. The words “ catering establishment ” shall mean any room, place or space in the city, which is used, leased or hired out in the business of serving food or beverages for a particular function, occasion or event, to which the public is not invited or admitted and wherein music or entertainment is permitted. (Subd. a, par. 4, added by Local Law 1945> No. 28, June 25.)
b. Public dance halls, cabarets and catering establishments; license.— It shall be unlawful for any person to conduct, maintain or operate, or engage in the business of conducting, maintaining or operating, a public dance hall, cabaret or catering establishment unless the premises wherein the same is conducted, maintained or operated are licensed in the manner prescribed herein. (Subd. b as amd. by Local Law, 1945, No. 28, June 25.)
d. [Annual license fee is $150.]
e. [Licensed premises are to be closed between 4:00 a.m. and 8:00 A.M.]
f. Suspension and revocation of license. A license may be suspended or revoked by the commissioner for any violation of law or upon the ground that disorderly, obscene or immoral conduct is permitted on the licensed premises ”.

. Present cabaret and dance ball laws and regulations stem from legislation introduced in the Municipal Assembly on June 17, 1926, by the then Mayor of the City of New York. The proposed law was referred to the Committee on Local Law which reported back on December 7,1926. 'Its findings are as follows i
“ The Municipal Assembly of the City of New York
Aldermanic Branch
Aldermanie Chamber, City Hall, Tuesday,
December 7, 1926, 1:15 o’clock P.M.
“ Reports of Committees
“ Ree. No. 10
“Report of the Committee on Local Laws in favor of adopting a Local Law to regulate Dance Halls and Cabarets and providing for licensing same. The Committee on Local Laws, to which was referred on October 26, 1926, (Minutes pg 1937), the annexed local law to regulate Dance Halls and Cabarets and providing for licensing the same, respectfully
“ Reports
“Your committee gave two public hearings on this bill and its adoption was urged by the police and license commissioners, by clergymen of various denominations and citizens interested in social and recreational work. It was opposed by licensees and owners of cabarets, personally and by their attorneys, and by representatives of musical organizations.
“ These night clubs or cabarets are simply dance halls, where food is served at exorbitant prices to the time of jazz and tabloid entertainment. A very frank opposition was voiced by one of the licensees, on the ground that when strangers came to New York they wanted to ‘run Wild.’ Well, there has been altogether too much running ‘wild’ in some of these night clubs and in the judgment of your committee the ‘wild’ stranger and the foolish native should have the cheek-rein applied a little bit. It is well known that the ‘ wild’ strangers are not at all interested in our great museums of art and history, in our magnificient churches and public libraries, our splendid parks and public monuments. They are interested in speakeasies and dance halls and return to their native heaths to slander New York.
“Your committee believes that those ‘wild’ people should not be tumbling out of these resorts at six or seven o’clock in the morning to the scandal and annoyance of decent residents on their way to daily employment.
“ Favorable action is recommended.”
Subsequently and on December 12, 1926, Local Law No. 12 was enacted and went into effect on January 1, 1927. (People v. Greenberg, 12 Mise 2d 396.)

. Committees on Civil Rights of the New York State Bar Association and of the New York County Lawyers Association, and the Committee on the Bill of Rights of the Association of the Bar of the City of New York.

. A few comments by the great might be appropriate: Thus, to Samuel Pepys, in his celebrated Diary, for July 30, 1666, “ Musiek is the thing of the world that I love most.” Thomas Carlyle describes music as “the speech of angels.” (Essays, The Opera.) Plato, in The Republic, Book III, 401-D, recommended musical instruction highly, stating: “ Musical training is a more potent instrument than any other, because rhythm and harmony find their way into the inward places of the soul.” To Friedrich Wilhelm Nietzche, “ Without music life would be a mistake. (The Twilight of the Idols, Maxims & Missiles, 33.) Henry Wadsworth Longfellow, in Outre-Mer, described music as “the universal language of mankind.” “ Music must take rank as the highest of the fine arts,” said Herbert Spencer, “ as the one which, more than any other ministers to human welfare.” (Essays on Education, On the Origin and Function of Music.) “ Music hath charms to soothe a savage breast, to soften rocks, or bend a knotted oak”, said William Congreve in The Mourning Bride (Act I, Se. 1).
“ The man that hath no music in himself, Nor is not mov’d with concord of sweet sounds, Is fit for treasons, stratagems, and spoils; * * ’* Let no such man be trusted.” warns Shakespeare in The Merchant of Venice (Act Y, Se. 1, line 83). Mr. Justice Felix Fbankeurteb in “Advice to a Young Man Interested in Going into Law” urged “No less important for a lawyer is the cultivation of the imaginative faculties by reading poetry, seeing great paintings, * * * and listening to great music.” (The World of Law [1960] Ephraim London, vol. 2, p. 725.)