William: B. Groat, J.
On August 24, 1951 plaintiff was shot by a police officer employed by the defendant City of New York after plaintiff had struck and knocked down another officer who was attempting to frisk him. Plaintiff brought this action against the city to recover damages for the shooting on the theory of assault.
Since there is considerable conflict between the parties as to what actually happened and since decision of this case necessarily depends to a large extent on the credibility of the individual witnesses, the testimony of the principal witnesses will be set forth at some length.
Plaintiff testified that he was driving his car —a 1948 convertible — with the top down, between 8:00 and 9:00 p.m., on the evening of August 24, 1951. With him were his brother, Robert Burvick, his nephew, Wilfred Fishburne, and a friend named Katherine Jackson. According to plaintiff, he brought his car to a stop at 31st Avenue, which was at the corner from his home, when another car passed him. Two men, both in civilian clothes, got out of it and both came to the left side of plaintiff’s car. One had a gun in his hand, and he ordered plaintiff out of the car. The two men were identified at the trial as Detective Roger Horan and Lieutenant Joseph P. O’Brien, both members of the New York City Police Department.
Plaintiff testified that neither officer showed his badge nor did either say, ‘ ‘ I am a police officer. ’ ’ They began to search the plaintiff, and O’Brien struck plaintiff in the face. Then O’Brien ordered the rest of the people out of the car and started to search them. When plaintiff objected, O’Brien struck him again and knocked him down. O’Brien spun the plaintiff around, and as he turned, plaintiff hit O’Brien and then was shot by Horan in the right shoulder. Plaintiff had no weapon on his person or in the car; neither did his brother.
Plaintiff was taken to St. John’s Hospital in Long Island City, where he was kept overnight; he was then taken to Kings County Hospital, where he was kept three or four weeks. Later plaintiff spent about five days in Bellevue Hospital and thereafter consulted a private physician.
*480 On cross-examination plaintiff admitted that he was once known as Augustus Burvick, and under that name was convicted of vagrancy on June 6, 1942. Under the same name he was convicted of petty larceny on April 13, 1945, and was sentenced to 30 days in the workhouse. On November 16, 1947 under his present name he was convicted of “ Policy.” In 1944 or 1945 plaintiff was fined for having a fight with a policeman.
Plaintiff’s nephew, Wilfred Fishburne, testified that Horan was frisking him, and that as plaintiff said, ‘ ‘ What are you bothering the kid for 1 He is only 12 years old, ’ ’ his uncle was hit again by O’Brien. His uncle went down and came back up and hit O’Brien back, and then Horan shot the plaintiff. The iboy heard no words spoken between the time plaintiff struck O’Brien and the firing of the shot. Neither did he hear the police say, “ We are police officers.”
Plaintiff’s brother, Robert Burvick, testified that plaintiff was asked for his identification, and that when he reached in his back pocket for it, he was struck and went to the ground. Robert did not know the men were policemen. No badge was shown, no statement was made.
According to Robert, when plaintiff objected to their being frisked, he was struck by O’Brien. When he got up he struck O’Brien back. O’Brien staggered back and fell to the ground. Then a shot rang out. Robert heard no words uttered at any time. Robert went to aid his brother, but was told to get back.
On cross-examination Robert admitted that he had used the name Sparrow G-annis to conceal his identity when he was arrested in 1935 or 1936. He also admitted that he was convicted of “ train riding ” in 1936 under the name of Russell Jackson. On November 5, 1936, as Spirrko Gannis, he was convicted of burglary in The Bronx. On May 12, 1944, under 'his own name of Robert Burvick, he was convicted of grand larceny in Nanuet, New York, and was sentenced to 5 to 10 years in Sing Sing. He was released on parole in 1950.
Katherine Jackson testified that she was frisked by Horan; that O’Brien asked plaintiff for his license, but that when plaintiff put his hand in his pocket he was struck in the face by O’Brien; that O’Brien kept hitting plaintiff every time he answered a question. The last time O’Brien hit plaintiff, plaintiff struck back and O’Brien fell down. Then Horan shot the plaintiff in the back. The shooting took place in a split second; Horan did not say anything before shooting. Plaintiff’s brother Robert went to take a step towards his brother *481 and was kicked by Horan who told him to get back. At no time did O’Brien and Horan identify themselves as police officers.
Clarence Burger, a civilian employee of the Police Department, where he acts as supervising clerk, pursuant to subpoena, brought the folders containing the Police Department records of Detectives O’Brien and Horan. The records showed that no charge had ever been brought against either policeman. On cross-examination counsel for the defendant city then brought out the fact that both men had received citations for meritorious conduct several times. O’Brien had been cited twice; Horan had been cited 10 times and in addition had received the Police Combat Cross for arresting four men engaged in an armed robbery. On that occasion the holdup men started shooting as Horan entered the premises. He returned the fire, wounding two of them and disarming the others.
John Hart testified that he is a senior parole officer and that on August 24, 1951 plaintiff’s brother Robert was under his supervision as a parolee; that after the incident on which this suit is based Robert admitted to Hart that he had had a few beers on the night of the incident. This constituted a violation of parole.
Joseph O’Brien, called by the defendant city, testified that he is now a Lieutenant in the Police Department and the commanding officer of the homicide squad for Queens County. On August 24, 1951, he was a detective and was driving along with Horan, in civilian clothes, on police business, in an unmarked police car, when plaintiff’s car passed the police car at a great rate of speed. O’Brien was driving the police car and he decided to keep the plaintiff in view. Plaintiff’s car passed two cars that were making a “U” turn, and O’Brien decided to chase plaintiff’s car and they sounded the siren. When plaintiff eventually slowed down O’Brien drove the police car in front of plaintiff’s ear at an angle.
Horan walked to the driver’s side of the car; O’Brien went around to the passengers’ side. O’Brien had his shield in his right hand. He had had his gun in his hand as he approached the car, but put it back in his holster when he saw a woman and a child on the passenger side of the car. He opened the car door and a bottle clattered to the street; with his foot he pushed it aside and found it was an empty pint whiskey bottle. He asked the woman and the boy to step out and step back, which they did.
Meanwhile Horan brought the plaintiff around the back of the car and O’Brien met him and took the plaintiff to the *482 passenger door. Horan then got the other passenger and brought him to the rear fender. O’Brien attempted to frisk the plaintiff to see if he had any weapon, but each time he approached plaintiff to put his hands on him plaintiff swung around, and O’Brien would hit him on the shoulder and push him back. Thereupon plaintiff went into a boxer’s crouch and when O’Brien went to reach for plaintiff’s arms, he got hit in the eye. The blow lifted him off his feet and knocked him to the ground. His face was numb. O’Brien felt for his eye and then shouted, ‘ ‘ I think my eye is out. ’ ’ Then he heard a shot. He got to his feet and walked about a couple of minutes. Then a civilian came over and took him over to his house and let him use the telephone to call for assistance. He called the desk officer at the 114th Precinct.
Police officers and an ambulance arrived. Thereupon O ’Brien was taken to St. John’s Hospital, where three stitches were put under his right eye. He testified that he identified himself as a police officer when he asked the woman and boy to step out of the car.
After he was struck O’Brien did not lose consciousness, but he was dazed and could see nothing. He heard the shot, but he heard no conversations or exclamations. It was a matter of seconds from the time he shouted about his eye until he heard the shot. At the time he could not see where the plaintiff was.
Roger Horan testified that he is a first grade detective; that on August 24, 1951, he was in a squad car with O’Brien when a car passed at a speed of 60 miles per hour or better. They followed the car which proceeded in a zigzag fashion through two cars making “ U ” turns without decreasing its speed. They pulled up in front of the plaintiff.
Horan had his shield in his left hand and his gun in his right hand. He approached the driver’s side of the car and said to him, “ Police. Turn the motor off and get out with your hands up.” Plaintiff got out, put his hands up and made some incoherent remark about “ cops.” Horan took plaintiff around the rear to the other side of the car where O’Brien pushed him towards the front of the car. Horan then went back for plaintiff’s brother. As he took him around, Horan thought he passed something to the boy, so he called the boy over to frisk him.
As Horan was touching the boy’s jacket he noticed O’Bzien was having trouble with the plaintiff who had his fists up. O’Brien turned plaizitiff towards the car several times and then plaintiff struck O’Brien who fell to the ground. Plaintiff *483 followed O’Brien and threw several more punches at him. Horan yelled to him to stop or he would shoot. Then plaintiff’s brother Robert started to move towards Horan and plaintiff reached for and grabbed O’Brien’s gun by the handle, whereupon Horan shot the plaintiff. Plaintiff’s brother then stopped advancing on Horan.
Horan asked a passerby to call the police for assistance. O’Brien was standing around in a daze. Horan permitted Mrs. Jackson to help plaintiff, but he did not allow plaintiff’s brother to go to him. Then police cars and an ambulance arrived and plaintiff was placed in the ambulance and O’Brien sat in the front with the driver. They were taken to St. John’s Hospital. The police took plaintiff’s brother and Mrs. Jackson to the 114th squad, but the boy could not be found.
When plaintiff struck O’Brien, Horan heard O’Brien call out, “ Roger, I think my eye is out.” Horan felt that if plaintiff got O’Brien’s gun he might shoot either of them or someone else. Horan did not know plaintiff or his brother at the time of the incident and did not know that they had criminal records. When Horan fired at the plaintiff, plaintiff was bending over O’Brien. After the shot plaintiff fell to the ground.
The above summary of the testimony indicates that there is a sharp issue of fact as to exactly what happened and, as was noted at the outset of this memorandum, decision of this case turns largely on the question of credibility. It may as well be said right here and now that the court finds the facts to be as testified to by the police officers.
In the first place, both plaintiff and his brother have criminal records and while this would not prevent them from telling the truth the fact that plaintiff’s brother was at the time of the incident still on parole may have had some bearing on their conduct when they Avere stopped by the police. On the other hand, the police officers both have excellent records in the department. Not only have they never been charged Avith any misconduct, but, on the contrary, both of them have been cited more than once for excellent police work.
Moreover, in the nature of things, if plaintiff’s car had not been speeding there Avould have been no occasion for the police to stop it. They were not patrolling generally at the time, but were on a specific mission to investigate something for another precinct, a task which admittedly was not of an urgent nature. Under those circumstances it is much more probable that they would not have been distracted from their own work *484 .unless they were convinced that they had come upon something which required investigation.
With respect to whether the police showed their badges, it is inherently more probable that police officers, in their own self-interest, would identify themselves promptly. On the whole case, therefore, insofar as there are issues of fact involved, the court finds the testimony of the police officers to be the credible version of the facts in this case.
Plaintiff contends that since he had not been arrested at the time the officers were frisking him, their search of his person, •without a warrant, was unlawful and that, therefore, he had a legal right to resist, using no more force than was necessary. (People v. Defore, 242 N. Y. 13; People v. Cherry, 307 N. Y. 308.)
While it is true the police officers had not yet said that they were arresting the plaintiff there were grounds for arrest if plaintiff was driving at 60 miles per hour (Sutton v. Evans, 4 A D 2d 580) and, under the circumstances of this case, the detectives, having apprehended the plaintiff in the actual commission of the crime or in immediate pursuit thereafter, would not be required to inform plaintiff either of their authority or of the cause of arrest. (Code Grim. Pro., § 180; Squadrito v. Griebsch, 1 N Y 2d 471.)
In any event, even assuming that the arrest and search were unlawful and that plaintiff had the right to resist, he could not, in such instance, use more force than was necessary. (Penal Law, § 246, subd. 3.) After he had struck O’Brien and knocked him down, plaintiff had no right to continue the attack and to attempt to take O’Brien’s gun. (Cf. People v. Carlton, 115 N. Y. 618, 623.) Under those circumstances Horan was justified in repelling plaintiff’s attack upon O’Brien. The force used by Horan, when his warning to stop was ignored, was not unreasonable in the light of the danger to himself and O’Brien if plaintiff succeeded in wresting O’Brien’s gun from his holster.
The complaint is dismissed. Enter judgment accordingly.