The People of the State of New York, Respondent, *v.* Fellie Cherry, Appellant.

Argued May 24, 1954; decided July 14, 1954.

*Samuel Korb* for appellant. Defendant was unlawfully arrested and assaulted, and had the right to resist with force sufficient to prevent these offenses against his person. (*People* v. *O'Connor*, 257 N. Y. 473; *People* v. *Defore*, 242 N. Y. 13; *Stearns* v. *Titus*, 193 N. Y. 272; *Snead* v. *Bonnoil*, 166 N. Y. 325.)

*Edward S. Silver, District Attorney* (*William I. Siegel* of counsel), for respondent. I. In the Appellate Division respondents conceded that the conviction was improper on the facts and in law. (*People* v. *O'Connor*, 257 N. Y. 473; *People* v. *McCarthy*, 188 Misc. 132; *People* v. *Hill*, 131 Misc. 521; *People* v. *Richter*, 265 App. Div. 767.) II. Nevertheless in this court we urge that the order of the Appellate Division should be affirmed. The Appellate Division's opinion is a finding and decision on the facts that appellant was not entitled to the protection of the Penal Law (§ 246, subd. 3) in that he had used more force than sufficient to prevent an offense against his person. This court may not review the order. (*People* v. *Boas*, 92 N. Y. 560; *People* v. *Ledwon*, 153 N. Y. 10; *People* v. *Helmer*, 154 N. Y. 596; *People* v. *Sherlock*, 166 N. Y. 180; *People* v. *McCarthy*, 250 N. Y. 358; *People* v. *Bearden*, 290 N. Y. 478; *People* v. *Wrieden*, 299 N. Y. 425.)

FULD, J. Defendant, a plumber by trade, doing absolutely nothing improper, doing nothing, indeed, even to excite suspicion, was accosted and seized by two strangers, in ordinary street attire, claiming to be police officers, late at night as he was about to enter his home. What citizen would do less, if resistance, concededly permissible, was to be effective, than defendant did in this case? He used no artificial or man-made weapon of any sort, relying solely on those supplied by nature, his hands and his teeth.

The police officers were, as everyone acknowledges, guilty of an illegal arrest and an unlawful assault. (Code Crim. Pro.,

§ 177; see, e.g., *People* v. *O'Connor,* 257 N. Y. 473; *Snead* v. *Bonnoil,* 166 N. Y. 325.)[1] Defendant had the privilege, therefore, of resisting and using " force or violence " against his assailants, even though they were police officers, " to prevent an offense against his person * * * if the force or violence * * * [was] not more than sufficient to prevent such offense " (Penal Law, § 246, subd. 3).

From the quiet vantage of a library, and after the event, one might look back and figure that defendant should not have done more than remonstrate with his captors or even that he should have submitted to the illegal arrest and the attendant assault. But defendant was not accorded time for calm thought or reflection; he was faced with a fact, not a hypothesis, in the form of two men, not in uniform but in ordinary garb who appeared out of the night on a deserted street in Brooklyn. It was not he who started the fight; according to the record, he tried to get away, and it was only after one of the officers (and this is the latter's testimony) " lunged from the rear and got him around the shoulders " that he fought back. And he reacted as any reasonable and quick-witted person might under the circumstances: having no weapon, he grabbed his assailant by the wrist and bit his thumb.

The consequences were, we have no doubt, painful to the officer, but we do not see how a court may say that defendant employed more force than was reasonable under the very frightening circumstances that suddenly confronted him. If defendant had any right to prevent his arrest, he was privileged to take effective steps toward that end and was not confined to words or pushes or other futile gestures. Once the right to resist is acknowledged, it is impossible to conclude that this defendant used more force than — in the language of the statute — was " sufficient to *prevent* " his arrest, " [the] offense against his person," when, as we know, his efforts never even approached the point of success.

Whether or not the police officers exhibited their badges to defendant is completely beside the point. A badge may not substitute for a warrant of arrest, nor excuse its absence, when

1. In the Appellate Division, the district attorney actually suggested, with high-minded objectivity, that the judgment of conviction should be reversed.

one is required. Lacking the essential warrant, having abused the authority which was their trust, the officers stood bereft of their usual prerogatives. And whether or not defendant believed that they were police officers, he had a right to resist, and that quite apart from any fear or threat of physical harm and injury. For most people, an illegal arrest is an outrageous affront and intrusion — the more offensive because under color of law — to be resisted as energetically as a violent assault. In plain and unmistakable language, the legislature has recognized their right to do so.

The standard by which defendant must be judged is phrased solely in terms of the physical necessities of the situation presented. If force is necessary to prevent an unlawful arrest, then force may be employed, the one limitation on its exercise being that the victim may not pursue his counterattack merely for the sake of revenge or the infliction of needless injury. That, this defendant did not do.

The investigation of crime does not require and, certainly, does not justify a disregard of basic rights on the part of law enforcement officials. The legislature has deliberately and carefully enacted legislation authorizing an arrest without a warrant in limited fact situations, and police officers may not ignore the law's demands because they believe that effective policing or the end in view calls for such conduct. It may well have been misguided zeal, not deliberate violation of law, that underlay and accounted for what the officers here did. But, whichever it was, it would be a travesty to adjudge the very victim of the illegal arrest and the unprovoked attack guilty of the crime of assaulting his captors and assailants. The administration of justice would be ill served by such a result.

The judgment of the Appellate Division and that of the Court of Special Sessions should be reversed and the information dismissed.

DESMOND, J. (dissenting). Defendant, after a trial before a three-Justice Court of Special Sessions in Brooklyn, was convicted of assault in the third degree and given a (suspended) sentence of sixty days in the workhouse, which judgment was unanimously affirmed by the Appellate Division, Second Department, without opinion. Later, defendant was granted a reargu-

ment by the Appellate Division, and, on reargument, the court, while adhering to its original decision, wrote a brief memorandum in which it, in effect, affirmed the finding below that defendant committed an assault by using more force than resistance required.

The information on which defendant was tried accused him of third degree assault in that, on December 4, 1952, in Kings County, he "assaulted Patrick Gilchrist by unlawfully and wilfully striking, beating, wounding and ill-treating the said Patrick Gilchrist". It is conceded that defendant bit the thumb of Gilchrist, a police officer. The witnesses against defendant were Gilchrist and another police officer named Pizzimenti. For the defense, Gilchrist was recalled, defendant testified in his own behalf, and his wife testified for him, as did a woman named Jordan and two character witnesses. Gilchrist testified that he is a city patrolman and that, about ten o'clock on the night of December 4, 1952, he was at the corner of Franklin Avenue and Madison Street in Brooklyn, on foot and not in uniform. He had defendant under observation for about a half hour. Beginning at about 9:30 P.M., he and officer Pizzimenti had been seated in an automobile in the middle of the block on Madison Street, keeping a certain building under observation, and they observed defendant loitering about those premises. The witness saw two unknown men and a woman approach defendant and engage in a conversation, and then saw defendant enter a building which they were watching. Very shortly thereafter, defendant came out, according to Gilchrist, and walked to the corner, where Gilchrist approached defendant, told him that he (Gilchrist) was a police officer and asked defendant to show some identification. Patrolman Pizzimenti was with Gilchrist and Pizzimenti also announced to defendant that he was a police officer. He said that defendant looked at the officers, walked away a few steps and stopped, and said that he did not believe they were "cops", and asked them to show him their police shields again. Then he started to run, brushing against Officer Pizzimenti, whereupon Patrolman Gilchrist, from the rear, grabbed defendant around the shoulders and defendant took Gilchrist's left hand by the wrist, put Gilchrist's thumb in his mouth and bit. Gilchrist testified that he received medical atten-

tion at a hospital and, as a result, was " out sick " for several days. In his cross-examination he said that he afterwards learned that defendant lived in the basement of 110 Madison Street, which was apparently the building the policemen were watching, that after they, from their automobile, had watched defendant for some time, they got out of the automobile, crossed over to defendant's side of the street, and then stopped him at the street corner. Gilchrist said that at first he put his hand on defendant's elbow, at the same time stating that he was a police officer and showing his badge. The other officer was standing nearby. Neither officer knew defendant. Gilchrist testified that at that first encounter he was not arresting defendant. He testified that the officers were taking defendant over to a building so that they could talk to him out of the stream of traffic since there were quite a few people passing by. He said that when defendant started to run away, which was just before the biting, Gilchrist then grabbed defendant and put him under arrest. When asked whether defendant had committed any crime, Gilchrist testified: " He bolted past my brother officer ". He said that, after this, defendant was dragging Gilchrist along the street with Gilchrist's thumb in defendant's mouth, and that when Gilchrist freed his thumb defendant fell to the ground.

The next witness was Patrolman Pizzimenti, who, too, swore that the police officers twice showed their badges to defendant. Pizzimenti said that he secured the release of Gilchrist's thumb by punching defendant in the eye, that Pizzimenti then told defendant to get in the car but that defendant threw himself on the ground and the officers had to pick him up and put him in the car by force. He said that, after they got to the police station, he (Pizzimenti) told defendant that the latter was foolish since he had been told that the men were police officers, and that defendant replied that he knew he was wrong and that he was sorry. On cross-examination Pizzimenti said that both officers approached defendant from the side and rear, that defendant walked along with them for a few steps on the sidewalk, whereupon defendant stated that he did not believe they were police officers and they, for a second time, showed him their shields and then defendant attempted to brush past them. Then, according to Pizzimenti, Gilchrist threw his arms around

defendant's arms or shoulders. Nowhere in the record is there any explanation of why the officers were watching the particular building or watching defendant.

On defendant's case, defendant recalled Patrolman Gilchrist but his testimony at that point does not seem to have been of much importance. The next witness was defendant himself who testified that, with his wife and four children, he lived in the basement and parlor floor at 110 Madison Street, that he had lived there about eight years, that he was a plumber by trade, that he had been convicted of petty larceny in 1946, but had never since been convicted of any crime. He said that on the evening in question he had come home from work about seven o'clock and had gone out again about 8:30 P.M. to make some collections, that he had collected some money for some jobs he had done, and that he had arrived home about a quarter of ten. He said that he had parked his car in a garage around the corner from his home and then, carrying some packages, went directly into the basement of his premises without making any stops or meeting anybody on the street. He said that at his home were his wife and two visitors and that, at his wife's request, he went out, a few minutes after he had arrived home, to buy some ice cream, that he walked along Madison Street, and, just before he got to Franklin Avenue, two men coming from behind grabbed hold of his arm and told him to get into a doorway. He had not seen them before. He tried to pull away from them. He saw no police badges. He was frightened because he had the money on his person and thought they were stick-up men. While he was pulling away from them, he testified, he was hit in the eye and began to yell for help. In the course of the struggle one man's hand " slipped past my face and I grabbed ahold of his thumb with my mouth ". After that the men stopped trying to get him into the doorway and then tried to load him into a car. Then, he says, he was hit on the ear and went down and one of the men was over him. While he was lying there someone told him to get up because the men were policemen. Then a uniformed policeman came along, helped defendant up, got him into a car and told him that the others were police officers. The next witness was Mrs. Cherry, wife of defendant, who testified that her husband came home about a quarter of ten, then went

out almost immediately to get the ice cream. Mrs. Jordan, who was a visitor at defendant's home that night, gave similar testimony. Then two character witnesses gave testimony for defendant.

The argument of defendant is based on section 177 of the Code of Criminal Procedure and subdivision 3 of section 246 of the Penal Law. Section 177 permits a peace officer without a warrant (there was, of course, no warrant here) to arrest a person for a crime committed or attempted in his presence, or when the person arrested has committed a felony although not in the peace officer's presence, or when a felony has, in fact, been committed and the officer has reasonable cause for believing the person arrested to have committed it. There is no showing that any of these conditions were present here. Subdivision 3 of section 246 of the Penal Law says that it is not unlawful to use force or violence on the person of another when the violence is done by a party about to be injured, in preventing or attempting to prevent an offense against his person " if the force or violence used is not more than sufficient to prevent such offense ". In its memorandum opinion after reargument here, the Appellate Division said that, assuming that the detention of defendant was a false arrest, which he might resist, " he nevertheless had no right to use more force than such resistance required ". Noting that the trial court had believed the testimony of the police officers, the Appellate Division said that, that being so, " there was no cause for appellant to apprehend bodily harm, and his violent conduct in biting a police officer supports the conclusion that thereby he committed an assault ". In other words, the Appellate Division, assuming for the sake of argument that the conduct of the police officers amounted to an unlawful arrest, nevertheless, taking the facts, as found, that defendant had been informed that the two men were police officers and had been shown their police badges, held that there was no necessity for him to commit mayhem. In other words, we now have a finding by Special Sessions, affirmed by the Appellate Division (eight Justices authorized, unlike us, to pass on *facts,* unanimously so voting), that defendant did use more force than was sufficient to prevent the offense which was being committed on him. Whether or not we believe the testimony

of the police officers, we are bound by the findings of fact below and so we must start from that factual premise. Of course, we must assume, too, as the Appellate Division did, that the arrest or detention of this man was unlawful, since there was no showing of any of the elements required by the Code of Criminal Procedure for an arrest. However, the fact that the arrest or detention was illegal does no more than put the situation under the coverage of section 246 of the Penal Law (*supra*) and leaves us with the question of whether defendant used more than sufficient force, which is a question of fact. In most of the cases in which subdivision 3 of section 246 is discussed, the difficulty arises because of instructions to a jury, said to be erroneous. We do not have that situation here, but here we have a trial by court without a jury, a fact finding as to what occurred, and a finding that more than sufficient force was thereby used.

The "not more than sufficient" force idea must be applied reasonably and not literally. If that were not so, anyone, no matter how slight the trespass against him, might resist to the death. In *Magar* v. *Hammond* (183 N. Y. 387, 390), a civil case, Chief Judge CULLEN wrote: "though the plaintiff and his associates were engaged in the commission of a crime, that crime was only a misdemeanor and it did not authorize the use against them of a deadly weapon or the infliction upon them of serious bodily harm." A case quite similar to ours is *People* v. *Murray* (54 Hun 406), decided by the First Department in 1889, where a defendant had been seen by a police officer to be running through the streets with a knife in his hand, whereupon the officer asked complainant to help him secure defendant and complainant reached to grab defendant, whereupon defendant attempted to stab complainant, resulting in a conviction of defendant of assault in the second degree. The court wrote this (pp. 408–409): "That assault cannot be justified, even upon the theory of an illegal arrest. Holahan had, apparently, no weapon. He had not then drawn his club. He simply attempted, with open hands, to seize Murray's person. If he thus erred in doing what he supposed to be his duty, Murray had no right to use greater force than was essential to maintain his freedom. He was certainly responsible, on the facts stated,

for the unnecessary attempt to stab, and for that wrongful and willful act he was justly convicted.'' That decision is quite close here, since there, as here, there was no showing that defendant was committing any crime when the police officers attempted to restrain him.

Although I have found no direct New York authority on the question, it seems obvious to me that the force '' not more than sufficient '' which a citizen may use in his own defense means not more than the amount of force that would have been deemed necessary by a reasonable person in a similar situation (see *People* v. *Semikoff*, 137 Cal. App. 373, 376). The amount of force reasonably to be deemed necessary depends on the existing conditions (see 4 Am. Jur., p. 153, § 51), and one of those conditions here would be the fact, as found and affirmed below, that defendant knew these two men were policemen because he had been shown their official badges.

The whole of our law as to self-defense is limited to the use of '' such force as might be reasonably necessary '' (see *People* v. *Lumsden*, 201 N. Y. 264, 269; Penal Law, § 42). Once an assault is prima facie proven, it is a matter of defense that the force used was reasonably necessary under the circumstances. It can hardly be said that such a defense was here established as matter of law and beyond dispute.

The judgment should be affirmed.

LEWIS, Ch. J., DYE and VAN VOORHIS, JJ., concur with FULD, J.; DESMOND, J., dissents in opinion in which FROESSEL, J., concurs; CONWAY, J., taking no part.

Judgments reversed, etc.

