89 N.J. Super. 169 (1965)
214 A.2d 428
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
KURT KOONCE AND FLORENCE KOONCE, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued April 12, 1965.
Decided October 26, 1965.
*171 Before Judges CONFORD, KILKENNY and LEWIS.
Mr. Samuel H. Nelson argued the cause for appellants (Mr. Jack Trugman, attorney).
Mr. Michael F. Riccardelli, Assistant Prosecutor, argued the cause for respondent (Mr. Brendan T. Byrne, Essex County Prosecutor, attorney).
*172 The opinion of the court was delivered by CONFORD, S.J.A.D.
Certain charges against the defendants arising out of an arrest of defendant Kurt Koonce ("Kurt," hereinafter) by Newark police officers for selling liquor to a minor were tried before the Municipal Court of the City of Newark. The charge against Kurt of unlawful sale to a minor was, according to the docket record, "dismissed for lack of evidence." A complaint against Kurt for assault and battery on Police Officer Costanzo resulted in a conviction and a 90-day jail term in the county penitentiary. Both Kurt and Florence Koonce ("Florence," hereinafter) were convicted on a complaint of assault and battery on Police Captain Zizza; Kurt was sentenced to time spent in jail and Florence to a $25 fine.
On appeal to the Essex County Court, and after a trial de novo, Kurt was found guilty of the assault on Costanzo but acquitted of the charge as to Zizza. He was sentenced to a 90-day jail term. Florence was found guilty of the assault on Zizza and fined $25. They appeal their convictions to this court; additionally, Kurt complains his sentence was excessive.
There were other charges and dispositions, including one against Washington Koonce for interfering with an officer in the performance of his duty, but these are not involved in the present appeals of Kurt and Florence.
The events which here concern us occurred in the early morning of May 30, 1964 at a tavern on Springfield Avenue in Newark known as the Glitter Club. Washington Koonce was president of the corporate alcoholic beverage control licensee. He was father of Kurt and husband of Florence. At approximately 1:30 A.M. uniformed patrolmen of the Newark Police Department arrived in response to a call from the club that a patron was brandishing a knife. By the time, shortly thereafter, that Captain Zizza and other officers arrived, the police were in process of removing the offender. However, they noticed that some of the patrons present seemed to be minors, whereas R.S. 33:1-77 makes the sale of any *173 alcoholic beverage to a minor a misdemeanor (subject to certain provisos). Testimony offered at the trial de novo fairly permitted the following findings of fact as to the events thereafter. Zizza had observed an apparent patron, one Carol Gray, standing at the bar with a glass of amber-colored fluid in her hand. He questioned her about her age and she told him it was 24 and that she was born in 1942. She then corrected the birth year to 1940. At that point he turned the interrogation over to Detective Thomas to whom she admitted she was 17. Zizza asked her who had served her, and her response was, "I can't tell you nothing." Zizza noticed a strong smell of alcohol on her breath. Behind the bar were three men and a woman. Zizza asked them who served the girl, whereupon Kurt handed Zizza a slip of paper containing Miss Gray's signature to a statement that she was over 21, which he said she had given him three weeks previously. But he said no one had served her liquor.
In addition to the Koonces there was another bartender on duty at the time. There was defense testimony that Kurt was not then on bartending duty, having completed that stint at 6 P.M. the previous evening, but that he was washing glasses and cleaning tables just before the incident in question. Zizza testified that when he entered the premises Kurt was "the bartender working" the end of the bar where Miss Gray was. Another officer, however, testified Kurt had been "outside the bar," "fixing something."
Zizza told Kurt that he was under arrest for serving a minor. Kurt at first came from behind the bar, "apparently resigned to the fact that he was coming with us" (Zizza's testimony). However, he then returned to a position behind the bar, ostensibly to get his cigarettes, but ultimately refused to go with the officers. Zizza then ordered Costanzo to "go and take Kurt Koonce." Zizza's testimony was to the effect that as Costanzo reached out to take Koonce "he was met with a flailing of arms, punching." Zizza jumped over the bar to assist Costanzo who was being punched by Kurt. But Zizza was punched from the rear by Florence. He was struck repeatedly *174 "all around my body." The defendants were then subdued and removed. Zizza's testimony was corroborated by that of Costanzo, who added the detail that he was hit by Kurt when he put a handcuff on his right wrist. There was also corroboration of Zizza's account of the events by the testimony of Officers Thomas and McParland.
For the defense, Carol Gray testified that she had gone into the bar to make a phone call. Although she had been drinking before she went to the bar, she did not order anything or have anything to drink while she was there. She was stopped by the policemen as she was on her way out, after having made the call. She lied about her age because she was scared. Washington Koonce testified that at the time in question he was tending bar with another man other than Kurt. He denied that anyone had served Miss Gray and he had orally protested to the police the arrest of his son. At the time, his wife had been working at the cash register. Washington stated that the officers shoved his wife aside and seized his son. At no time did either of them physically resist or strike the officers. The officers also forcibly seized his wife. This version was substantiated by the testimony of Florence and Kurt. Kurt added that prior to the incident he had been clearing tables in the bar. He denied serving Miss Gray. Jimmy Weems, a patron of the bar, corroborated the stories of the three defendants.
The trial judge in the Essex County Court found the testimony of the police witnesses basically credible and that of the defense witnesses not, in relation to the respective factual versions as to the assaults charged against the defendants, with the dispositions stated hereinabove.

I.
The first appellate contention  that the factual basis for the State's claim of assault was not established at the trial beyond a reasonable doubt  may be dismissed summarily. The case was tried by a judge without a jury. He could have properly *175 believed the police witnesses and disbelieved the defendants and their supporting witnesses as to the physical, objective events relevant to the complaint of assault and battery of Kurt on the person of Officer Costanzo and that against Florence for the same offense against Captain Zizza. We will not disturb the findings in these respects made by the trial court. See State v. Johnson, 42 N.J. 146 (1964). They were supported by "sufficient credible evidence present in the record." Id., at p. 162.

II.
Defendants' second appellate point is that "defendants' alleged conduct, in repelling an unlawful arrest, was legally justified." Here defendants invoke the common-law rule that a citizen may use such force as may be reasonably necessary to repel or prevent an illegal arrest. 1 Wharton, Criminal Law (12th ed. 1932), §§ 851-854, pp. 1148-1153; 6 C.J.S., Assault and Battery, § 92(d), p. 949; see State v. Ronnie, 41 N.J. Super. 339, 343 (Law Div. 1956). They contend that since the statutory offense of selling liquor to a minor, though denominated a "misdemeanor," is punishable by imprisonment for not more than 90 days, R.S. 33:1-51; Jucker v. Recorder's Court of Irvington, 133 N.J.L. 12, 13 (Sup. Ct. 1945), it is in the category of common-law misdemeanor rather than felony, State v. Doyle, 42 N.J. 334, 349 (1964); State v. Hutchins, 43 N.J. 85, 100 (1964), for purposes of applying the general common-law rule that a peace officer may arrest without a warrant (there was no warrant here) for a misdemeanor only if the offense was committed in his presence, see State v. Smith, 37 N.J. 481, 494 (1962), certiorari denied 374 U.S. 835, 83 S.Ct. 1879, 10 L.Ed.2d 1055 (1963).
Defendants face a preliminary hurdle in that this contention was not raised before the trial court, and ordinarily, of course, a ground of appeal will not be heard on appeal which was not made to the trial court. Defendants point out, however, that they did at the conclusion of the State's case *176 make a motion to dismiss the interference charges on the ground of the illegality of the arrest. As to the presently appealing defendants, the motion was denied. But the motion, unaccountably, did not encompass the assault charges, and we would ordinarily, for that reason, reject consideration of the point. However, if the defendants' position has merit it goes to the essence of their guilt or innocence and would warrant consideration on principles of substantial justice. Moreover, the point involves, in its resolution, a subject of urgent public concern in the law-enforcement field. For these reasons we will entertain the argument on its merits.
We turn, then, to the first premise of the thesis advanced: Kurt Koonce did not violate R.S. 33:1-77 in the presence of the arresting police; therefore, his arrest for that offense was unlawful. We have little difficulty in agreeing with defendants to this extent, i.e., that assuming a violation of the statutory proscription of sale to a minor by some person connected with the operation of the Glitter Club on the occasion in question in the presence of the officers, the officers had insufficient basis for a determination that Kurt was the offender to justify his arrest.
Certain interesting and fairly debatable questions are subordinately implicated in the assumption postulated in the foregoing paragraph. We shall not here resolve them definitively.
(1) Is the offense of "sale" of liquor to a minor over and concluded with the payment by the customer and placement of the beverage on the bar, or does it continue while the liquor is being consumed on the premises? Compare Utah Liquor Control Commission v. Mandeles, 99 Utah 507, 108 P.2d 512 (Sup. Ct. 1940); People v. Foster, 10 N.Y.2d 99, 176 N.E.2d 397, 217 N.Y.S.2d 596 (Ct. App. 1961) (decided by a 4-3 vote), on the one hand, with Davids v. State, 208 Md. 377, 118 A.2d 636 (Ct. App. 1955), on the other; and see Annotation, 76 A.L.R.2d 1432, 1441 (1961). Consider also that while in respect of the purveyor the statute literally makes criminal only the sale to the minor, it punishes as disorderly *177 conduct the act of the minor in consuming the beverage on the premises or in entering the premises for the purpose of "purchasing, or having served or delivered to him" such beverage. N.J.S.A. 33:1-81.
(2) State v. Smith, supra, defines the requirement of commission of the offense in the "presence" of the arresting officer as meaning that the "officer know of the event by the use of his senses" (37 N.J., at p. 495). The test was easily satisfied in that case because almost all the facts constituting the offense and indicative of the identity of the offender were susceptible of direct sensory perception by the arresting officer. The one fact not so susceptible, that the substance being handled was narcotics, was one of virtually inescapable inference from the sensorily perceived events. The court appeared to approve the concept of "probable cause," as employed in search and seizure law, as a usable criterion for purposes of the sufficiency of the circumstantial evidence to establish knowledge by the arresting officer of those elements of the crime not susceptible of direct sensory perception. Ibid. Compare the language of section 6(1) (A) of the Uniform Arrest Act (1939), which in substance or effect has been adopted in New Hampshire, Rhode Island, Delaware and California:
"(1) An arrest by a peace officer without a warrant for a misdemeanor is lawful whenever:
A. He has reasonable ground to believe that the person to be arrested has committed a misdemeanor in his presence."
On the other hand, see the more stringent yet persuasive formulation in Davids v. State, supra: "Where some evidence of the commission of a misdemeanor reaches an officer through his senses, and it is augmented by other strongly persuasive facts in his possession, all of which is sufficient to convey virtual knowledge to any normal mind that the misdemeanor is being committed" (Emphasis added 118 A.2d, at p. 638)
If one accepted the concept of the forbidden sale to the minor as a continuing crime, ongoing during the course of consumption of the beverage, even the Davids test would seem *178 satisfied by the evidence in this case insofar as commission of the offense by someone in the Koonce organization is concerned. But this does not settle the question as to whether the evidence was sufficient to indicate the identity of the offender as Kurt.
(3) Is the fact that the charge against Kurt of sale to a minor was dismissed in the municipal court, for lack of evidence, conclusive against the hypothesis of his having committed that very offense in the presence of the officers for purposes of determining the legality of the ensuing arrest? The State may appeal from a dismissal of an indictment or accusation, R.R. 3:5-5(b)(7), but "acquittal" precludes retrial for an offense. Const. 1947, Art. 1, par. 11. See State v. Williams, 30 N.J. 105, 120-121 (1959); State v. Cannarozzi, 77 N.J. Super. 236, 241-242 (App. Div. 1962).
Most authority is against the State on the question posed above. People v. Dreares, 15 App. Div.2d 204, 221 N.Y.S.2d 819 (App. Div. 1961), affirmed 11 N.Y.2d 906, 182 N.E.2d 812, 228 N.Y.S.2d 467 (Ct. App. 1962); Parrott v. Commonwealth, 287 S.W.2d 440 (Ky. Ct. App. 1956); State v. Mobley, 240 N.C. 476, 83 S.E.2d 100 (Sup. Ct. 1954). Contra: People v. Edge, 406 Ill. 490, 94 N.E.2d 359 (Sup. Ct. 1950).
The State argues that the Alcoholic Beverage Control Act itself eliminates the requirement of commission of the offense in the presence of the arresting officer as a condition of validity of the arrest, when it provides in R.S. 33:1-71:
"To the end that local police and other enforcing agencies shall enforce this chapter in the interest of economy and effective control, all officers shall use all due diligence to detect violations of this chapter and shall apprehend the offenders and make a proper complaint before a magistrate. Arrests may be made as in other cases of misdemeanors."
We tend to regard the provisions quoted as not definitive of the particular problem here posed. Clearly, the mandate to "apprehend the offenders" must be read with the last sentence. *179 But the meaning of the latter is uncertain since the question of legality of arrests for "misdemeanors," as of the date of enactment of the statute, 1933, was far from clear. See State v. Smith, supra (37 N.J., at pp. 493-494); State v. Doyle, supra.
We conclude that by the evidence of their sensory perception and all reasonable inferences therefrom the police officers could not lawfully conclude that it was Kurt who was committing the postulated offense of sale to (or serving of) the minor. Kurt was one of at least three, possibly four, persons behind the bar, any one of whom could have made the sale insofar as anything to the contrary was then known or perceived by the police. Any supportive inference of Kurt's guilt by reason of his coming forward to defend the transaction on the basis of the slip purportedly signed by Miss Gray three weeks before does not have the weight ascribed to it in this regard by the police. The same applies to Zizza's testimony, seemingly not in accord with that of another officer, that Kurt was behind the bar near Miss Gray when Zizza entered the premises.[1] Note the statement in Davids v. State, supra, which is one of the authorities relied upon by the State here, that the evidence must be such that the arresting officer "cannot be mistaken as to the offender" (118 A.2d, at p. 638). While we do not necessarily approve this language as a criterion for any and all contexts in which the rule requires application, we nevertheless conclude on all the facts here presented that the arrest of Kurt was illegal. The police had inadequate basis for a belief that any offense then being committed in their presence (if any there was) was being committed by Kurt.

*180 III.
We are thus finally brought to the determinative issue in the case. Is the so-called common-law rule of right of a citizen to physical resistance to an illegal arrest by a police officer to be taken to be the law of New Jersey in present-day society? We have concluded to the contrary.
While, as indicated above, there is no doubt that the common-law rule is that a citizen has the right of reasonable resistance, even to the extent of force, to an illegal arrest by a police officer, and American jurisdictions, generally, continue to adhere thereto, see, e.g., People v. Cherry, 307 N.Y. 308, 121 N.E.2d 238, 240 (Ct. App. 1954), no New Jersey court of highest jurisdiction has expressly applied or approved that rule, to our knowledge, nor is it declared by legislative enactment, and we are therefore free to examine the question of its continued justification as a part of our non-statutory law in contemporary civilization. Cf. Clemens v. O'Brien, 85 N.J. Super. 404, 416 (App. Div. 1964); State v. Chiarello, 69 N.J. Super. 479, 496-502 (App. Div. 1961), certification denied 36 N.J. 301 (1962).
In State v. Ronnie, 41 N.J. Super. 339, 343 (Cty. Ct. 1954), the court applied the rule, without comment as to its merit, in relation to a determination on the admissibility of evidence. In Brown v. State, 62 N.J.L. 666 (E. & A 1899), defendant was convicted of murder when he shot a plain-clothes policeman in escaping after an arrest by the latter on suspicion of a felony or attempted felony. The opinion of Mr. Justice Dixon, dissenting from an affirmance, states that the issues involved the question of the lawfulness of the arrest, since failure of the State to prove such lawfulness should have caused the arrest to be "treated as any other unlawful interference with personal liberty  as an act which may be lawfully resisted" (Id., at p. 719). In the course of its determination that the portions of the trial court's charge under attack contained nothing prejudicially injurious to defendant's rights, the opinion of the majority had no occasion *181 to express agreement or disagreement with Justice Dixon's thus stated view, the charge containing nothing in derogation of defendant's supposed common-law rights in the respect noted.
Both the Uniform Arrest Act and the Model Penal Code recommend abolition of the common-law rule. Section 5 of the former provides:
"If a person has reasonable ground to believe that he is being arrested by a peace officer, it is his duty to refrain from using force or any weapon in resisting arrest regardless of whether or not there is a legal basis for the arrest."
Professor Warner, Reporter to the Interstate Commission on Crime, which formulated the Uniform Arrest Act, explained the background of the law of arrest preceding organization of regular metropolitan police forces in early 19th Century England as follows:
"[It] was developed largely during a period when most arrests were made by private citizens, when bail for felonies was usually unattainable, and when years might pass before the royal judges arrived for a jail delivery. Further, conditions in the English jails were then such that a prisoner had an excellent chance of dying of disease before trial." Warner, "The Uniform Arrest Act," 28 Va. L. Rev. 315 (1942)
See also Hall, Legal and Social Aspects of Arrest, 49 Harv. L. Rev. 566, 578-592 (1936).
In the Warner article cited above the author goes on to discuss the rule here at issue:
"It has always been illegal to resist a lawful arrest. But [contra] if the arrest is unlawful * * *. The rule developed when long imprisonment, often without the opportunity of bail, `goal [sic] fever,' physical torture, and other great dangers were to be apprehended from arrest, whether legal or illegal. * * *
When the law of arrest developed, resistance to an arrest by a peace officer did not involve the serious dangers it does today. Constables and watchmen were armed only with staves and swords, and the person to be apprehended might successfully hold them off with his own weapon and thus escape." (28 Va. L. Rev., at p. 330)
*182 The new rule of the Uniform Act was justified in the same article on two grounds: first, that the fate of today's arrestee is usually a few hours in a reasonably clean place of detention rather than the probable consequences awaiting the arrestee of yore. (Id., at p. 315); second, and more important:
"Today, every [American] police officer is armed with a pistol and has orders not to desist from making an arrest though there is forceful resistance. Accordingly, successful resistance is usually possible only by shooting the officer to prevent him from shooting first." (Id., at p. 330)
Section 5 of the Uniform Arrest Act, or the equivalent thereof, is statute law in New Hampshire, Rhode Island, California and Delaware.
The Model Penal Code, § 3.04, recognizes in subsection 1 the general rule that force may be used in self-protection against unlawful force, but in subsection 2 places certain limitations upon that privilege, one of these being:
"(a) The use of force is not justifiable under this Section:
(i) To resist an arrest which the actor knows is being made by a peace officer, although the arrest is unlawful; * * *."
The American Law Institute's comment upon the foregoing provision recognizes that it is contrary to "existing law" in both tort and criminal jurisprudence but recommends legislative reconsideration:
"[T]here ought not be a privilege to employ force against a public officer who, to the actor's knowledge, is attempting only to arrest him and subject him to the processes of law. It should be possible to provide adequate remedies against illegal arrest, without permitting the arrested person to resort to force  a course of action highly likely to result in greater injury to himself than the detention. Cf. People v. Cherry, supra [307 N.Y. 308, 121 N.E.2d 238 (Ct. App. 1954)].
The paragraph, it should be noted, forbids the use of force for the purpose of preventing an arrest; it has no application when the actor apprehends bodily injury, as when the arresting officer employs or threatens deadly force, unless the actor knows that he is in no peril greater than arrest if he submits to the assertion of authority.
It should be noted also that the paragraph does not apply to the resistance of illegal arrest by a person not known to the actor to be a peace officer. Here, moderate force may be employed * * *."
*183 The concordant conclusions of the Interstate Commission on Crime and of the American Law Institute seem to us the essence of sound public policy for the reasons they advance as well as others.
There is much discussion in the literature of arrest law as to the quantum of force which should be permitted the officer in a legal arrest and an arrestee in an unlawful arrest. See, inter alia, Moreland, "The Use of Force in Effecting or Resisting Arrest," 33 Neb. L. Rev. 408 (1954); "Justification for the Use of Force in the Criminal Law," 13 Stan. L. Rev. 566 (1961). These writings indicate a consensus that a line must be drawn beyond which the fracas resulting from an arrest may not go. The two works just cited submit that the officer's force must be tailored to the crime, i.e., that an officer may not kill to apprehend a driver whose hour has expired on the parking meter, but may use great force to subdue a murderer. Another commentator puts forth the tentative generalization that the victim of an unlawful arrest should be permitted to resist only if less than serious bodily harm will be inflicted upon the arrester. "Criminal Law: Force That May be Used to Resist an Illegal Arrest," 9 Okla. L. Rev. 60, 65 (1956).
But it seems to us that an appropriate accommodation of society's interests in securing the right of individual liberty, maintenance of law enforcement, and prevention of death or serious injury not only of the participants in an arrest fracas but of innocent third persons, precludes tolerance of any formulation which validates an arrestee's resistance of a police officer with force merely because the arrest is ultimately adjudged to have been illegal. Force begets force, and escalation into bloodshed is a frequent probability. The right or wrong of an arrest is often a matter of close debate as to which even lawyers and judges may differ. In this era of constantly expanding legal protections of the rights of the accused in criminal proceedings, one deeming himself illegally arrested can reasonably be asked to submit peaceably to arrest by a police officer, and to take recourse in his legal *184 remedies for regaining his liberty and defending the ensuing prosecution against him. At the same time, police officers attempting in good faith, although mistakenly, to perform their duties in effecting an arrest should be relieved of the threat of physical harm at the hands of the arrestee.
The principles expressed herein were adumbrated by this court in State v. Hayes, 52 N.J. Super. 178 (App. Div. 1958), where we held that the detention of a 17-year-old boy in a "bull pen" with adults, contrary to N.J.S. 2A:4-33, did not justify the boy's escape from detention even though the penal escape statute, N.J.S. 2A:104-6, speaks to persons "in lawful custody or control." Judge Goldmann there said:
"The great weight of authority, and reason, militate against defendant's claim that he had the right to break jail in the circumstances here present. The Legislature, presumably, sought to deter prisoners from attempting escape because of the great danger of violence such an attempt would involve, and the unquestioned disruption of discipline that would almost inevitably follow. If defendant prevails in this case, that deterrent effect would be weakened. * * *
To uphold defendant's contention would be to give prisoners the right of self-judgment and self-help. A minor and unintentional infraction of some legislative command would mean that escaping prisoners could hope to go entirely unpunished. This could only breed disrespect for the law." (at p. 187)
The concept of self-help is in decline. It is antisocial in an urbanized society. It is potentially dangerous to all involved. It is no longer necessary because of the legal remedies available.
Being confident that the Supreme Court of New Jersey would approve the foregoing views, we declare it to be the law of this State that a private citizen may not use force to resist arrest by one he knows or has good reason to believe is an authorized police officer engaged in the performance of his duties, whether or not the arrest is illegal under the circumstances obtaining.

IV.
So much decided, shall these defendants as a consequence stand rightfully convicted of assault? It must be remembered *185 that when the inculpated conduct occurred it was undoubtedly the general understanding that the common-law rule of right of resistance to an illegal arrest applied in this State, as witness State v. Ronnie, supra. The State has not argued that the force employed by defendants to repel the arrest was excessive. And, under State v. Ronnie, supra (41 N.J. Super., at p. 343), Florence's right as a relative to use reasonable force to repel an unlawful assault on her son was clear. Cf. State v. Chiarello, supra.
In the foregoing circumstances, the judicial evocation of an altered rule of criminal law should have prospective application only. See Johnson v. State, 18 N.J. 422, 429 (1955), certiorari denied 350 U.S. 942, 76 S.Ct. 318, 100 L.Ed. 822 (1956); State v. Jones, 44 N.M. 623, 107 P.2d 324 (Sup. Ct. 1940); State v. Stout, 90 Okl. Cr. 35, 210 P.2d 199 (Ct. Cr. App. 1949); Levy, "Realist Jurisprudence and Prospective Overruling," 109 U. Pa. L. Rev. 1, 8 (1960); 21 C.J.S. Courts § 194, p. 328; 20 Am. Jur.2d, Courts, § 236, p. 563. It is uniformly recognized that it would be fundamentally unjust to render criminal, by an overruling decision, conduct which was not criminal when it occurred. This would be equivalent in effect on the accused of an ex post facto statute.
The technique of prospective overruling is a useful judicial device in an appropriate case. Levy, op. cit. passim. Note its employment in State v. Smith, 32 N.J. 501, 557-558 (1960), and the declaration of its constitutionality (in civil cases) in Great Northern R. Co. v. Sunburst Oil & Ref. Co., 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932). This is such a case.
For the foregoing reasons, the conduct of the defendants having been free from criminality when it transpired it will not be rendered criminal by our present declaration that hereafter, as more specifically stated hereinabove, it shall not be lawful to resist a police officer undertaking to effect an arrest notwithstanding the illegality of the arrest.
Judgments reversed.
NOTES
[1] On direct examination, after testifying that Kurt said, "No, no one served her," Zizza testified, "Q. What did you say? A. Well, I got it then he has admitted to having served her * * *." From the entirety of the direct and cross-examination of Zizza it is clear Zizza did not mean Kurt admitted serving the girl on that occasion but on the previous occasion several weeks earlier.