OPINION OF THE COURT
Aileen Haas Schwartz, J.
The real test of a free society is the law’s view of a confrontation between the constable and the citizen. That crucible assumes a special gravity when words are a part of the offending conduct.
*789 Three issues are critical in the instant matter: Does the First Amendment immunize against criminal responsibility for unlawful conduct? May disorderly conduct (Penal Law, § 240.20), a violation, serve as the predicate “authorized arrest” for the crime of resisting arrest (Penal Law, § 205.30) in a juvenile delinquency proceeding? Does section 35.15 of the Penal Law, “Justification; use of physical force in defense of a person”, comprehend physical force against an arresting officer?
On September 30, 1980, two individuals were arrested by Starrett City special patrolmen and taken to the security office in the Sea Rise housing complex. Established security procedures for processing an arrest provided for the exclusion of everyone from the area immediately in front of the security office doors during the processing of an arrest. In accordance with the security procedure, Special Patrolman Perez was “standing guard” at the doors of the security office. Two patrolmen were in the security office. At approximately 20 minutes past 10 p.m., respondent who admitted knowledge of that security procedure, approached Special Patrolman Perez and demanded entry to the security office, stating that one of the arrestees was his cousin. (In fact, neither arrestee was related to respondent.) Special Patrolman Perez told respondent he would advise him of the details of the arrest and directed respondent to leave the proscribed area. Respondent continued his demands, stating “nobody going to stop me”, and used language abusive to the officer, composed largely of expletives. Ten to fifteen people approached the area. They were “yelling.” Respondent was twice directed by the patrolman to leave, “to stay away.” Special Patrolman Perez “kept telling him, you’re not allowed in this area at this time” — to no avail. The officer summoned his superior, Sergeant Di Viglio, to come to the main site.
Sergeant Di Viglio twice ordered respondent to leave the proscribed area. At one point, respondent did walk away, but he then returned and continued his demands in the same manner and in the same place. The 10 to 15 people remained. Sergeant Di Viglio testified, “After he had repeatedly failed to leave the area,” he instructed Perez to *790 arrest respondent for disorderly conduct and for refusal to obey an “order to vacate the area.”
As Special Patrolman Perez attempted to handcuff respondent, respondent struck the officer on the forehead with his closed fist. Special Patrolman Perez “went down”; he was “on the floor bleeding, in a lot of pain in the head, blood in my eyes.” There was a laceration on the top of his forehead. Sergeant Di Viglio grabbed respondent by the arm. The people gathered around them. Respondent tried to break away from Sergeant Di Viglio. Sergeant Di Viglio struck respondent on the head with a nightstick. He handcuffed respondent, and then aided Special Patrolman Perez and respondent into the security office.
Sergeant Di Viglio summoned a sector car to provide assistance.
Special Patrolman Perez and respondent were taken to the hospital. Respondent required 12 sutures.
A petition containing three charges (Penal Law, § 120.00, assault in the third degree; Penal Law, § 195.05, obstructing governmental administration; Penal Law, §205.30, resisting arrest) was filed. A demurrer to the allegations of obstructing governmental administration was sustained, although that ruling did not affect petitioner’s claim that arrest for obstructing governmental administration served as one of two bases for the crime of resisting arrest. Two charges thus remained viable for trial.
To turn to consideration of the three issues set forth above:
An essential element of the crime of resisting arrest (Penal Law, § 205.30) is a predicate “authorized arrest”. “[T]he crime of resisting arrest does not occur if the arrest is illegal or unlawful.” (People v Stevenson, 31 NY2d 108, 111.) The “authorized arrest” component of the crime requires proof beyond a reasonable doubt of compliance with the rules of arrest governed by constitutional, common-law and statutory standards. CPL article 140 embodies the constitutional probable or reasonable cause standard for arrest. That standard is defined by CPL 70.10 (subd 2) which prescribes two basic constituents: the reasonable likelihood “that such offense was committed and that such person committed it.”
*791 “Authorized arrest” for purposes of the crime of resisting arrest requires legal authority to arrest the individual charged and adherence to the probable or reasonable cause standard. Included in the latter requirement are: (1) classification of the conduct involved as an offense in the Penal Law or counterpart law (see Penal Law, § 10.00, subd 1) and (2) compliance by such law with constitutional standards.
The respondent’s attack upon each of the two predicate offenses as the basis for an authorized arrest poses serious questions. Challenge to the arrest based upon section 240.20 of the Penal Law, disorderly conduct, presents the lesser difficulty. As indicated above, CPL article 140 authorizes arrest, without a warrant, for an offense. Subdivision 1 of section 10.00 of the Penal Law defines “offense” as “conduct for which a sentence to a term of imprisonment or to a fine is provided by any law of this state or by any law, local law or ordinance of a political subdivision of this state, or by any order, rule or regulation of any governmental instrumentality authorized by law to adopt the same.” Section 721 of the Family Court Act, “Custody by police officer or peace officer without a warrant”, provides: “A peace officer or a police officer may take a person under the age of sixteen into custody without a warrant in cases in which he may arrest [a person] for a crime under article one hundred forty of the criminal procedure law. For purposes of this section, the term ‘crime’ used in article one hundred forty of the criminal procedure law refers to an act which, if committed by an adult, would constitute a crime.” Section 721 of the Family Court Act thus incorporates the law of arrest prescribed in CPL article 140 with a pertinent difference, limitation of arrest to arrest for a crime as contrasted with the more inclusive authorization for arrest for an offense. Subdivision 6 of section 10.00 of the Penal Law defines “crime” as “a misdemeanor or a felony.” Disorderly conduct (Penal Law, § 240.20) is classified as neither a felony nor a misdemeanor but rather as a “violation.”
The restrictive authorization prescribed by section 721 of the Family Court Act may not be cavalierly rejected as a mere technicality. Indeed, section 721 of the Family Court Act represents an integral part of the New York State *792 legislative design regarding juveniles. Section 731 of the Family Court Act defines juvenile delinquency in terms of an “act which, if done by an adult, would constitute a crime”. An allegation charging a violation “may not be the predicate for a juvenile delinquency proceeding.” (Matter of David W., 28 NY2d 589, 590.) Matter of David W. (supra) serves as an instructive if not compelling analogy: section 240.20 of the Penal Law, disorderly conduct, a violation, may not serve as the predicate for the “authorized arrest” component of the crime of resisting arrest.
Whether the arrest for obstructing governmental administration (Penal Law, § 195.05), a class A misdemeanor, may serve as the predicate for the “authorized arrest” component of the crime of resisting arrest under the circumstances presents more complex considerations. The gravamen of respondent’s challenge appears a virtual truism: statutorily and constitutionally, words alone may not be deemed to constitute the crime of obstructing governmental administration.
People v Case (42 NY2d 98) addressed the very issue of statutory construction raised by respondent. In that case, the offending conduct consisted solely of a “CB radio message from one motor vehicle operator to another as to the highway location of a radar speed checkpoint” (People v Case, supra, p 99). In dismissing the information charging “interference”, the Court of Appeals reasoned (supra, p 101): “A fair reading of this section can yield but one conclusion. The operative obstruction may be accomplished ‘by means of intimidation, physical force or interference, or by means of any independently unlawful act.’ If it be ‘interference’, then it must be physical interference, as ‘physical’ modifies ‘interference’ in the statute.” “[M]ere words alone”, the court stressed (supra, p 102), “do not constitute ‘physical force or interference’ such as to support the charge of obstructing governmental administration”.
Significantly, the Court of Appeals in People v Case (supra, pp 102-103), limited its decision to the terms of the statute, stating: “Under the express provisions of the statute, the interference would have to be, in part at least, physical in nature. The line is so drawn.” Chief Judge Breitel (supra, p 103 [concurring]) called for amendment *793 of the statute to overcome the defect, that is, the failure to render criminal a “scheme to frustrate a system of law enforcement to save lives and limbs on the highways of the State”.
To date, there has been no response by the Legislature to People v Case (supra) and more particularly to the concern of Chief Judge Breitel. The Legislature’s caution in this regard may be traceable to the initial painstaking care to draft a provision that would not be overly broad in a sensitive area and hence vulnerable to constitutional challenge. (See People v Case, 42 NY2d 98, 101-102, supra; Hechtman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 39, Penal Law, § 195.05, pp 395-396.)
To define the crime of obstructing governmental administration by making speech the operative obstruction would present problems of the gravest nature in our society.
There are some rights so basic that in Justice Cardozo’s famous language, “neither liberty nor justice would exist if they were sacrificed. *** This is true, for illustration, of freedom of thought, and speech. Of that freedom one may say that it is the matrix, the indispensable condition, of nearly every other form of freedom.” (Palko v Connecticut, 302 US 319, 326-327.) The history of American freedom is the history of First Amendment rights: freedom of speech, freedom of the press, the right to assemble, the right to petition the Government for a redress of grievances.
Supreme Court jurisprudence reflects a transcendent respect vigilantly afforded the First Amendment. That profound commitment to the First Amendment has not been diluted even when tested by cases involving espousal of doctrines odious to fundamental precepts of our society (Terminiello v Chicago, 337 US 1), the use of four-letter expletives (Cohen v California, 403 US 15), the burning of the American flag (Street v New York, 394 US 576).
Indeed, the court early recognized that “a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often *794 provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute *** is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest *** There is no room under our Constitution for a more restrictive, view. For the alternative would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups.” (Terminiello v Chicago, 337 US 1, 4-5, supra; see, also, confirmation in Cox v Louisiana, 379 US 536, 551-552; Edwards v South Carolina, 372 US 229, 237-238.)
Although First Amendment rights are not absolute, a case involving a challenge to State action upon First Amendment grounds is accorded heightened scrutiny. The cases involving such challenge teach the wisdom and, indeed, necessity of identifying the specific issue presented with exactitude.
The respondent contends that his arrest for obstructing governmental administration (Penal Law, § 195.05) is unlawful and hence, cannot serve as the predicate “authorized arrest” for the crime of resisting arrest (Penal Law, § 205.30). Of critical significance for purposes of First Amendment analysis, the arrest for the crime of disorderly conduct (Penal Law, § 240.20), which statute may well pose a high risk of vulnerability to such challenge, is no longer before the court as a predicate authorized arrest. Respondent does not argue that section 195.05 of the Penal Law is facially invalid.
As developed above, the Court of Appeals in People v Case (42 NY2d 98, supra) has interpreted the “operative obstruction by interference” portion of section 195.05 of the Penal Law to mean physical interference. The petitioner has established beyond a reasonable doubt that eliminating all speech elements, there was reasonable cause to arrest for obstructing governmental administration based solely upon respondent’s physical presence in the proscribed area immediately in front of the doors of the security office during the processing of an arrest in viola *795 tion of known security procedures and the refusal to obey four lawful police commands to leave the area — all with requisite mental culpability. Respondent’s First Amendment challenge thus concerns the effect of speech upon an otherwise lawful arrest for criminal conduct. Parenthetically, it is noted that the additional “nonphysical” dimension would not affect the validity of the arrest for statutory reasons. (See People v Case, 42 NY2d 98, 102, supra.)
Does speech ipso facto exonerate otherwise lawless conduct and immunize against criminal responsibility? An even less extreme argument was summarily dismissed in Giboney v Empire Stor. Co. (336 US 490, 498): “It rarely has been suggested that the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute. We reject the contention now.” “[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.” (Giboney v Empire Stor. Co., supra, p 502.) Proof of an element of a crime by means of words uttered, e.g., intent, does not constitute an abridgement of First Amendment rights. (Street v New York, 394 US 576, 594, Warren, Ch.J., dissenting, pp 599-600, supra.)
In United States v O’Brien (391 US 367), the Supreme Court upheld a conviction for burning a Selective Service registration certificate notwithstanding the defense that the act was one of protest against the Vietnam War and the draft, and hence was “symbolic speech” within the protective aegis of the First Amendment. The Supreme Court reasoned (supra, p 376): “[E]ven on the assumption that the alleged communicative element in O’Brien’s conduct is sufficient to bring into play the First Amendment, it does not necessarily follow that the destruction of a registration certificate is constitutionally protected activity. This Court has held that when ‘speech’ and ‘nonspeech’ elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the non-speech element can justify incidental limitations on First Amendment freedoms.”
*796 Most recently, in Haig v Agee (453 US _, _) the Supreme Court sustained a passport revocation “on the ground that the holder’s activities in foreign countries are causing or are likely to cause serious damage to the national security or foreign policy of the United States.” The Supreme Court expressly noted (supra, p ): “The revocation of Agee’s passport rests in part on the content of his speech: specifically, his repeated disclosures of intelligence operations and names of intelligence personnel *** Agee’s disclosures, among other things, have the declared purpose of obstructing intelligence operations and the recruiting of intelligence personnel.” To the argument of First Amendment protection, the Supreme Court responded (supra, p_.): “They are clearly not protected by the Constitution. The mere fact that Agee is also engaged in criticism of the Government does not render his conduct beyond the reach of the law.”
Nor can there be serious First Amendment challenge to the security procedure for processing arrests including the barring of all people from the vicinity immediately in front of the security office during the processing of an arrest. Adderley v Florida (385 US 39) compels rejection of such challenge. In Adderley v Florida (supra), the Supreme Court affirmed the convictions of student demonstrators who remained on jail grounds to protest the arrest, of schoolmates after the Sheriff had directed them to leave such area. To the claim of a constitutional right to stay in the area chosen as particularly appropriate to protest the jailing of other students, the Supreme Court responded (supra, pp 47-48), “Such an argument has as its major unarticulated premise the assumption that people who want to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please. That concept of constitutional law was vigorously and forthrightly rejected in two of the cases petitioners rely on, Cox v. Louisiana * * * We reject it again.” “The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized *797 society maintaining public order, without which liberty itself would be lost in the excesses of anarchy.” (Cox v Louisiana, 379 US 536, 554, supra.)
Haig v Agee (supra), United States v O’Brien (supra), Adderley v Florida (supra) and Giboney v Empire Stor. Co. (supra) thus instruct that the First Amendment does not ipso facto exonerate otherwise lawless conduct and immunize against criminal responsibility.
The arrest for obstructing governmental obstruction serves as the predicate authorized arrest for the crime of resisting arrest.
That conclusion does not resolve respondent’s defense of legal justification for his resistance to the arrest.
New York law has long been concerned with the interrelated rights and duties of the arresting officer and the individual faced with arrest. People v Cherry (307 NY 308, 311) states the then classic New York view:
“For most people, an illegal arrest is an outrageous affront and intrusion — the more offensive because under color of law — to be resisted as energetically as a violent assault. In plain and unmistakable language, the legislature has recognized their right to do so.
“The standard by which defendant must be judged is phrased solely in terms of the physical necessities of the situation presented. If force is necessary to prevent an unlawful arrest, then force may be employed, the one limitation on its exercise being that the victim may not pursue his counterattack merely for the sake of revenge or the infliction of needless injury.”
The officers in the People v Cherry (supra, p 309) case were dressed in street attire although they did state they were police officers as they seized the individual “late at night as he was about to enter his home.”
Section 35.27 of the Penal Law, the so-called “no-sock” principle, enacted in 1968 (amd 1980), changes the People v Cherry (supra) rule by prohibiting the use of physical force to resist even an unauthorized arrest by a peace officer “when it would reasonably appear that the latter is a peace officer.”
*798 Section 35.27 of the Penal Law, however, is but one facet of the defense of justification codified in article 35 of the Penal Law; article 35 of the Penal Law embodies a comprehensive, integrated legislative prescription regarding the defense of justification. Thus, one section formulates a standard of physical force permissible for peace officers in effecting an arrest. (Penal Law, § 35.30.) The general rule permits physical force to the extent reasonably believed necessary to effect the arrest. Another section prescribes the standard of permissible physical force in defense of a person. (Penal Law, § 35.15.) The general rule there permits physical force to the extent reasonably believed necessary to defend from the reasonably believed use or imminent use of unlawful physical force by another.
Notwithstanding section 35.27 of the Penal Law, the “no-sock” provision, the New York Court of Appeals has stressed, in citing section 35.15 of the Penal Law, “[T]here can be no cavil with the proposition that a citizen may use reasonable force in self-defense where the force exerted by the police in effecting an arrest is excessive.” (People v Stevenson, 31 NY2d 108, 112, supra.) “Nor,” the Court of Appeals added (supra, p 112) “can there be any doubt that force used by the police may reach such dimensions as to be illegal.”
Manifestly, as a matter of law, respondent is not foreclosed by virtue of section 35.27 from asserting the defense of justification. Rather does the deficiency of such defense lie with the facts. “Justification is a ‘defense’ * * * as opposed to an ‘affirmative defense’ — and ‘the people have the burden of disproving such defense beyond a reasonable doubt’.” (People v Steele, 26 NY2d 526, 528.) The petitioner has sustained that burden by proving that there was no factual basis for the claim of justification. Respondent struck the first blow, and the asserted animosity of Officer Perez toward respondent and his friends is rejected as “justification” for such act.
The petitioner has sustained the burden of proving beyond a reasonable doubt that respondent with requisite mental culpability committed the acts, as charged, that, “if done by an adult” (Family Ct Act, § 731), would constitute the crime of resisting arrest (Penal Law, § 205.30) and *799 assault in the third degree (Penal Law, § 120.00 [assault in the second degree, Penal Law, § 120.05, subd 3 was not charged]). See as to the crime of assault, Matter of Philip A. (49 NY2d 198).*

 Decision, including findings of fact and conclusions of law, was rendered orally on May 15, 1981.